# EXHIBIT A

**KNIGHT
FIRST AMENDMENT
INSTITUTE**

at Columbia University

**KATHERINE FALLOW**
Senior Staff Attorney

March 15, 2017

Dr. James V.M.L. Holzer
Deputy Chief FOIA Officer
The Privacy Office
U.S. Department of Homeland Security
245 Murray Lane, SW
STOP-0655
Washington, DC 20528-0655
Email: foia@hq.dhs.gov

FOIA Officer
Customs and Border Protection
1300 Pennsylvania Avenue, NW
Room 3.3D
Washington, DC 20229

U.S. Immigration and Customs
  Enforcement
Freedom of Information Act Office
500 12th Street, SW
STOP-5009
Washington, DC 20536-5009
Email: ICE-FOIA@dhs.gov

      **Re:    Freedom of Information Act Request
            Expedited Processing Requested**

To whom it may concern,

    The Knight First Amendment Institute at Columbia University ("Knight Institute") submits this request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records concerning suspicionless searches of individuals' electronic devices at the nation's borders.[1]

---

[1] The Knight First Amendment Institute is a New York not-for-profit corporation based at Columbia University that works to preserve and expand the freedoms of speech and the press through strategic litigation, research, and public education.

# I. Background

Directives issued in 2009 authorize officers of U.S. Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE") to search and detain travelers' electronic devices—including cell phones, tablets, and laptop computers—without individualized suspicion. CBP Directive No. 3340-049, *Border Search of Electronic Devices Containing Information* (Aug. 20, 2009), https://perma.cc/8JKP-P73Z; ICE Directive No. 7-6.1, *Border Searches of Electronic Devices* (Aug. 18, 2009), https://perma.cc/9455-Z2AX CBP Directive No. 3340-049, *Border Search of Electronic Devices Containing Information* (Aug. 20, 2009), https://perma.cc/8JKP-P73Z.

The CBP Directive, for example, broadly authorizes CBP officers to search electronic devices "with or without individualized suspicion." CBP Directive § 5.1. It further permits CBP officers to seize electronic devices without individualized suspicion for the time necessary to search them, *id.* § 5.3, and to share and indefinitely retain information on devices if, after reviewing the information on a device, CBP officers determine that there is probable cause to believe that it "contains evidence of or is the fruit of a crime that CBP is authorized to enforce," *id.* § 5.4.1.1. The Directive also allows sharing and indefinite retention—even in the absence of probable cause—of "terrorism-related information," *id.* § 5.4.1.4, and of "information relating to immigration, customs, and other enforcement matters if such retention is consistent with the privacy and data protection standards of the system of records in which such information is retained," *id.* § 5.4.1.2.

Though it broadly authorizes invasive searches of sensitive data, the CBP Directive contains few privacy protections. Even for especially sensitive data, the Directive appears to require little more than consultation before searching. For legally privileged material, for example, the Directive provides "special handling procedures" that require CBP officials to "seek advice . . . before conducting a search of the material." *Id.* § 5.2.1. For medical and journalistic records, the Directive requires consultation and that the records "be handled in accordance with any applicable federal law and CBP policy," *id.* § 5.2.2, without specifying what that applicable law or policy might be.

CBP and ICE officials have searched the electronic devices of thousands of individuals, including U.S. citizens, without individualized suspicion. Those searches increased dramatically over the past year: officers reportedly conducted 25,000 searches in 2016 as compared to

5,000 searches in 2015.² In February 2017 alone officers conducted 5,000 searches of electronic devices.³

Over the past year, CBP has searched and, in some instances, seized information stored on the electronic devices of journalists, despite their objections to the forced disclosure of confidential source information. According to press reports:

1. CBP officers detained and interrogated French–American photojournalist Kim Badawi while searching the contents of his cell phone, including his private photos and his WhatsApp messages with a Syrian refugee source.⁴

2. Isma'il Kushkush, a former acting bureau chief of the *New York Times* in East Africa, likewise reported that officers had interrogated him about his reporting on refugees while searching his electronic devices.⁵

3. Canadian photojournalist Ed Ou was denied entry into the United States after refusing to provide CBP officers the passwords to his electronic devices. During Ou's six-hour detention, officers read his journal despite their acknowledgment that Ou was a journalist. Additionally, Ou suspected that they may have removed the SIM cards from his devices before returning them to him.⁶

4. Wall Street Journal reporter Maria Abi-Habib was detained at the Los Angeles International Airport after refusing to turn her cell phones over to CBP officers. She was released only after the officers consulted their supervisors.⁷

---

² Cynthia McFadden, et al., *American Citizens: U.S. Border Agents Can Search Your Cell Phone*, NBC News (Mar. 13, 2017), http://www.nbcnews.com/news/us-news/american-citizens-u-s-border-agents-can-search-your-cellphone-n732746 [hereinafter "NBC News, *American Citizens*"].

³ *Id.*

⁴ Alexandra Ellerbeck, *Security Risk for Sources as U.S. Border Agents Stop and Search Journalists*, Committee to Protect Journalists (Dec. 9, 2016), https://www.cpj.org/blog/2016/12/security-risk-for-sources-as-us-border-agents-stop.php.

⁵ *Id.*

⁶ *Id.*

⁷ Mazin Sidahmed, *Department of Homeland Security detains journalist returning from Beirut*, The Guardian (Jul. 21, 2016), https://www.theguardian.com/media/2016/jul/21/homeland-security-journalist-maria-abi-habib-detained; Noah Feldman, *Your Privacy Doesn't Matter at the Border*, Bloomberg View (Aug. 28, 2016),

3

Additionally, since President Trump's Executive Order 13,769 took effect, CBP appears to be targeting Muslims, including U.S. citizens who are Muslim, for electronic device searches at the border.[8] These suspicionless searches and seizures of Americans' electronic devices raise serious constitutional questions. To help the public better understand the government's policies and the way they are being implemented, the Knight Institute files this FOIA request.

## II. Records requested

The Knight Institute requests the following documents:

1. Any document containing statistical information concerning the search, detention, retention, or sharing of electronic devices or information of individuals at the border (or functional equivalent of the border) since FY2012, including, but not limited to, documents reflecting:

    a. the number of travelers whose electronic devices or information were searched, detained, retained, or shared;

---

https://www.bloomberg.com/view/articles/2016-08-28/your-privacy-doesn-t-matter-at-the-border.

[8] Press Release, *CAIR-FL Files 10 Complaints with CBP After the Agency Targeted and Questioned American-Muslims About Religious and Political Views*, CAIR Florida (Jan. 18, 2017), https://www.cairflorida.org/newsroom/press-releases/720-cair-fl-files-10-complaints-with-cbp-after-the-agency-targeted-and-questioned-american-muslims-about-religious-and-political-views.html; NBC News, *American Citizens* (describing incidents where Akram Shibly, a Muslim American of Syrian descent, was twice stopped by CBP while traveling between the U.S. and Canada and asked to turn over cell phone and password); Daniel Victor, *What Are Your Rights if Border Agents Want to Search Your Phone?*, N.Y. Times (Feb. 14, 2017), https://www.nytimes.com/2017/02/14/business/border-enforcement-airport-phones.html?_r=0; Kaveh Waddel, *A NASA Engineer Was Required to Unlock His Phone at the Border*, The Atlantic (Feb. 13, 2017), https://www.theatlantic.com/technology/archive/2017/02/a-nasa-engineer-is-required-to-unlock-his-phone-at-the-border/516489/; *see* Kaveh Waddell, *A Stand Against Invasive Phone Searches at the U.S. Border*, The Atlantic (Feb. 21, 2017), https://www.theatlantic.com/technology/archive/2017/02/ron-wyden-border-searches/517353/; Joshua Kopstein, *Travelers Affected By Trump Ban Forced to Unlock Phones, Computers*, Vocativ (Jan. 30, 2017), http://www.vocativ.com/397897/travelers-affected-by-trump-ban-forced-to-unlock-phones-computers/; *see also* Sophia Cope, *Fear Materialized: Border Agents Demand Social Media Data from Americans*, Electronic Frontier Foundation (Jan. 25, 2017), https://www.eff.org/deeplinks/2017/01/fear-materialized-border-agents-demand-social-media-data-americans.

  b. the number or portion of those travelers who are U.S. citizens;

  c. the number or portion of those travelers who are lawful permanent residents or green card holders;

  d. the number or portion of those travelers by country of origin;

  e. the number or portion of those travelers by gender, race, ethnicity, nationality, and/or country of birth;

  f. the number or portion of those travelers by port of entry; and

  g. the number or portion of those travelers by watchlist, lookout, and/or other selectee status.

2. Documents relating to each instance since FY2012 in which CBP or ICE searched, detained, retained, or shared an electronic device or the information accessible on it, including, but not limited to:

  a. a list of the TECS data field categories used to record and track each electronic device search conducted by CBP or ICE; and

  b. all information contained in the TECS system used to record and track electronic device searches, detentions, retentions, and/or sharings.[9]

---

[9] In 2011, the Department of Homeland Security's Office for Civil Rights and Civil Liberties ("CRCL") issued an Impact Assessment concerning the border searches of electronic devices. DHS, Office for Civil Rights and Civil Liberties, *Impact Assessment: Border Searches of Electronic Devices* (Dec. 29, 2011), https://perma.cc/P4FZ-BY6G ("2011 Impact Assessment"). The 2011 Impact Assessment noted that CBP records the fact of each device search and other information about it in the TECS system, but that the monitoring had been found to be "inadequate." *Id.* at 8. The 2011 Impact Assessment noted that CBP's Office of Internal Affairs had proposed that CBP improve its tracking of device searches through "a new TECS module" or by "enhanc[ing] existing modules." *Id.* CBP agreed with this recommendation, *id.*, and according to the Executive Summary issued by CRCL in 2013, CBP "implemented this change beginning in FY2012." DHS, Office for Civil Rights/Civil Liberties, *Impact Assessment: Border Searches of Electronic Devices* (Jan. 29, 2013), https://perma.cc/TRW2-CRCR. This portion of our request seeks all data in the TECS system (or any module, software, or database designed to take its place) since

5

3. Revisions of or documents supplementing or superseding:

    a. CBP Directive No. 3340-049, *Border Search of Electronic Devices Containing Information* (Aug. 20, 2009); or

    b. ICE Directive No. 7-6.1, *Border Searches of Electronic Devices* (Aug. 18, 2009).

4. The following documents relating to any reviews of CBP's or ICE's policies or practices concerning electronic device searches:

    a. any audits, impact assessments, or other reviews of CBP's or ICE's policies or practices concerning electronic device searches, including any such reports by the Office for Civil Rights and Civil Liberties, DHS's OIG, and CBP's Office of Internal Affairs, Management Inspection Division;

    b. any policies, practices, procedures, and/or training materials adopted as a result of any audits, impact assessments, or other reviews of how CBP and ICE conduct electronic device searches; and

    c. any documents reflecting annual or semi-annual examinations by CBP or ICE of electronic device searches by port of entry, as adopted in response to the 2011 Impact Assessment.

5. Documents, including tear sheets and TRIP records, containing or relating to complaints filed by individuals or organizations about CBP's and/or ICE's search, review, retention or sharing of the information on travelers' electronic devices.

6. Documents reflecting policies, practices, or procedures concerning how CBP officers handle "privileged or other sensitive material," including "work-related information carried by journalists," as referenced in § 5.2 of the CBP Directive.

7. Documents reflecting policies, practices, and procedures concerning CBP's anti-discrimination policy as applied to discretionary device searches.

---

FY2012. We request that the data be provided in electronic format. *See* 5 U.S.C. § 552(a)(3)(B).

6

Where a document contains information that falls into one or more of the categories described above, we seek the entirety of that document. If processing the entirety of a given document would be unusually burdensome, we ask that you give us an opportunity to narrow our request. Please disclose all segregable portions of otherwise exempt records. *See* 5 U.S.C. § 552(b).

We also ask that you provide responsive electronic records in their native file format or a generally accessible electronic format (e.g., for tabular data, XLS or CSV). *See* 5 U.S.C. § 552(a)(3)(B). Alternatively, please provide the records electronically in a text-searchable, static-image format (e.g., PDF), in the best image quality in the agency's possession, and in separate, Bates-stamped files.

Finally, we ask that you process our request on a rolling basis, giving priority to categories 1 and 2.

### III. Application for Expedited Processing

The Knight Institute requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). There is a "compelling need" for the documents sought because the information they contain is "urgent[ly]" needed by an organization primarily engaged in disseminating information "to inform the public about actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

*A. The Knight Institute is primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The Knight Institute is "primarily engaged in disseminating information" within the meaning of FOIA. 5 U.S.C. § 552(a)(6)(E)(v)(II).

The Knight First Amendment Institute is a newly established organization at Columbia University dedicated to defending and strengthening the freedoms of speech and the press in the digital age. Research and public education are essential to the Institute's mission.[10] Obtaining information about government activity, analyzing that information, and publishing and disseminating it to the press and public are among the core activities the Institute was established to perform. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material

---

[10] Mike McPhate, *Columbia University to Open a First Amendment Institute*, N.Y. Times (May 17, 2016), https://perma.cc/YC9M-LUAD; James Rosen, *New Institute Aspires to Protect First Amendment in Digital Era*, McClatchy DC (May 20, 2016), https://perma.cc/ZS2K-FPED.

7

into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").

### B. The records sought are urgently needed to inform the public about actual or alleged government activity.

The documents sought are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). The records sought have generated intense public interest. Since the beginning of this year alone, reports of suspicionless searches of electronic devices at U.S. borders and international airports have abounded.[11] Certain of those reports detail instances in which CBP officers exerted pressure or outright force to obtain electronic devices and passcodes.[12] The public has thus far been denied the benefit of complete records revealing the number of searches conducted, the individuals subjected to such searches, and the circumstances surrounding such searches. Those records are urgently needed to understand the scope and lawfulness of the searches conducted pursuant to the CBP and ICE Directives.

For these reasons, the Knight Institute is entitled to expedited processing.

### IV. Application for Waiver or Limitation of Fees

The Knight Institute requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and that disclosure is "likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

For the reasons explained above, disclosure of the records would be in the public interest. Moreover, disclosure would not further the Knight Institute's commercial interest. The Institute will make any information disclosed available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA to ensure "that it be liberally construed in favor of waivers for noncommercial requesters." *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003).

---

[11] NBC News, *American Citizens*; *see, e.g.*, Victor, *supra* note 8; Waddel, *A NASA Engineer Was Required to Unlock His Phone at the Border*, *supra* note 8; Waddell, *A Stand Against Invasive Phone Searches at the U.S. Border*, *supra* note 8; Kopstein, *supra* note 8; *see also* Cope, *supra* note 8.

[12] *See* NBC News, *American Citizens*; Victor, *supra* note 8; Waddel, *A NASA Engineer Was Required to Unlock His Phone at the Border*, *supra* note 8.

The Knight Institute also requests a waiver of search and review fees on the grounds that it qualifies as an "educational . . . institution" whose purposes include "scholarly . . . research" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The Institute has a substantial educational mission. Situated within a prominent academic research university, the Institute will perform scholarly research on the application of the First Amendment in the digital era. The Institute is in the midst of inaugurating a research program that will bring together academics and practitioners of different disciplines to study contemporary First Amendment issues and offer informed, non-partisan commentary and solutions. It will publish that commentary in many forms—in scholarly publications, in long-form reports, and in short-form essays.

The Knight Institute also requests a waiver of search and review fees on the grounds that it is a "representative[] of the news media" within the meaning of FOIA and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The Institute meets the statutory definition of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *accord Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 282 (D. Conn. 2012); *ACLU of Wash. V. DOJ*, No. C09-0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011); *ACLU*, 321 F. Supp. 2d at 30 n.5. Courts have found other non-profit organizations, whose mission of research and public education is similar to that of the Knight Institute, to be "representatives of the news media." *See, e.g., Cause of Action v. IRS*, No. 13-0920, 2015 WL 5120863 (D.C. Cir. Aug. 28, 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding non-profit group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. DOJ*, 133 F. Supp. 2d 52, 53 – 54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).

For these reasons, the Knight Institute is entitled to a fee waiver.

\*       \*       \*

Thank you for your attention to our request. We would be happy to discuss its terms with you over the phone or via email to clarify any aspect of it or, where reasonable, to narrow our request.

Sincerely,

/s/ Katherine Fallow
Katherine Fallow
Knight First Amendment Institute at
 Columbia University
314 Low Library
535 West 116th Street
New York, NY 10027
katie.fallow@knightcolumbia.org
(212) 854-9600