**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) **No. 1:17-cv-00548-TSC** ) |
| **DEPARTMENT OF HOMELAND SECURITY,** *et al.,* | ) ) ) |
| **Defendants.** | ) ) ) |

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR <u>SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................2

I.  THE WITHHOLDINGS UNDER EXEMPTION 5 THAT PLANTIFF CHALLENGES ARE JUSTIFIED ............................................................................................................2

    A.  THE WITHHOLDINGS OF DHS ARE JUSTIFIED ...........................................................2

    B.  THE WITHHOLDINGS OF CBP ARE JUSTIFIED .........................................................10

    C.  THE WITHHOLDINGS OF ICE ARE JUSTIFIED...........................................................11

II.  THE WITHHOLDINGS UNDER EXEMPTION 7(C) THAT PLAINTIFF CHALLENGES ARE JUSTIFIED ...............................................................................13

    A.  DISCLOSURE OF THE WITHHELD INFORMATION IS SUFFICIENTLY LIKELY TO INVADE THE PERSONAL PRIVACY OF THE INDIVIDUALS TO WHOM IT PERTAINS TO BRING IT WITHIN THE PURVIEW OF EXEMPTION 7(C).......................................................14

    B.  THE PUBLIC INTEREST DOES NOT FAVOR DISCLOSURE OF THE WITHHELD INFORMATION ......................................................................................................18

III.  THE WITHHOLDINGS UNDER EXEMPTION 7(E) THAT PLAINTIFF CHALLENGES ARE JUSTIFIED ...............................................................................20

    A.  THE WITHHOLDINGS OF CBP ARE JUSTIFIED .........................................................20

    B.  THE WITHHOLDINGS OF ICE ARE JUSTIFIED...........................................................28

IV.  THE DHS AND ICE DECLARATIONS AND *VAUGHN* INDICES COVER ALL RECORDS THAT REQUIRE COVERAGE ...................................................................31

    A.  THE DHS DECLARATIONS AND *VAUGHN* INDICES COVER ALL RECORDS THAT REQUIRE COVERAGE...............................................................................................31

    B.  THE ICE DECLARATIONS AND *VAUGHN* INDEX COVER ALL RECORDS THAT REQUIRE COVERAGE...............................................................................................32

V.  ALL NON-EXEMPT MATERIAL THAT OUGHT TO HAVE BEEN RELEASED HAS BEEN RELEASED.................................................................................................33

CONCLUSION...................................................................................................................35

## TABLE OF CASES

Page

*Abidor v. Napolitano*, 990 F. Supp. 2d 260 (E.D.N.Y. 2013) ...................................................9, 22

*Alasaad v. Nielsen*, 419 F. Supp. 3d 142 (D. Mass. 2019) ..............................................................9

*Arthur Andersen & Co. v. IRS*, 679 F.2d 254 (D.C. Cir. 1982)......................................................12

*Brady Ctr. to Prevent Gun Violence v. Dep't of Justice*, 410 F. Supp. 3d 225 (D.D.C. 2019) .......3

*Calderon v. Dep't of Agric.*, 236 F. Supp. 3d 96 (D.D.C. 2017) ....................................................33

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ....................................................................17

*Djenasevic v. Exec. Office for U.S. Att'ys*, 2019 WL 5390964 (D.C. Cir. Oct. 3, 2019) .............30

*EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959 (D.C. Cir. 1999)....................................................8, 9

*House v. Napolitano*, 2012 WL 1038816 (D. Mass. Mar. 28, 2012)................................................8

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)...........................................................................4

*Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771 (D.C. Cir. 2002) .................................34, 35

*Judicial Watch, Inc. v. Dep't of Def.*, 847 F.3d 735 (D.C. Cir. 2017) .............................................4

*Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986) ......................................................................33

*NARA v. Favish*, 541 U.S. 157 (2004) ...........................................................................................17

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) .............................16

*Pub. Citizen Health Rsrch. Grp. v. Acosta*, 363 F.3d 1 (D.D.C. 2018) ........................................17

*Schrecker v. Dep't of Justice*, 349 F.3d 657 (D.C. Cir. 2003)..................................................18, 19

*Shapiro v. Dep't of Justice*, 893 F.3d 796 (D.C. Cir. 2018) .............................................24, 26, 27

*United States v. Kim*, 103 F. Supp. 3d 32 (D.D.C. 2015) .............................................................11

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ...................................................................................4

*Zaidan v. Trump*, 317 F. Supp. 3d 8 (D.D.C. 2018) .....................................................................19

## TABLE OF EXHIBITS

Ex. A        Supp. Decl. of James V.M.L. Holzer (June 11, 2020)

Ex. B        Decl. of Patrick A. Howard (June 11, 2020)

Ex. C        Supp. Decl. of Toni Fuentes (May 26, 2020)

Ex. D        U.S. Customs and Border Protection (CBP), *About CBP*, https://www.cbp.gov/
             about

Ex. E        CBP, *Border Searches of Electronic Devices*, CBP Dir. No. 3340-049A (Jan. 4,
             2018)

Ex. F        CBP, *Inspection of Electronic Devices*, https://www.cbp.gov/sites/default/files/
             documents/inspection-electronic-devices-tearsheet.pdf

## INTRODUCTION

Defendants Department of Homeland Security (DHS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE) have moved for summary judgment in this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Plaintiff Knight First Amendment Institute at Columbia University has cross-moved for summary judgment.  Plaintiff contends in its motion that DHS, CBP, and ICE have failed to provide adequate justifications for certain of their withholdings under FOIA Exemption 5; that certain of the withholdings of CBP under FOIA Exemption 7(C) cannot be justified; that CBP and ICE have failed to provide adequate justifications for certain of their withholdings under FOIA Exemption 7(E); that the declarations and *Vaughn* indices of DHS and ICE do not cover certain records that ought to be covered; and that certain non-exempt information that ought to have been released has not been released.  Pl. Corrected Mem. Supp. Cross Mot. Summ. J. & Opp'n Def. Mot. Summ. J. (Pl. Mem.), ECF No. 50-1, at 11, 20, 25, 34, 40.  Plaintiff therefore asks that its motion be granted and that DHS, CBP, and ICE be directed to release "the withheld information at issue." *Id.* at 41. Plaintiff no longer seeks any relief from the Transportation Security Administration or the DHS Office of Inspector General.  *Id.* at 1 n.1.

Plaintiff's contentions are without merit.  The withholdings under Exemptions 5, 7(C), and 7(E) that plaintiff challenges are justified; the DHS and ICE declarations and *Vaughn* indices cover all records that require coverage; and all non-exempt material that ought to have been released has been released.  Defendants' motion for summary judgment should therefore be granted and plaintiff's cross motion for summary judgment should be denied.

## ARGUMENT

### I.    THE WITHHOLDINGS UNDER EXEMPTION 5 THAT PLAINTIFF CHALLENGES ARE JUSTIFIED.

Plaintiff contends that "[the] declarations and accompanying *Vaughn* entries" of DHS, CBP, and ICE "have failed to demonstrate the applicability of the deliberative process, attorney-client, and work product privileges to six categories of documents."  Pl. Mem. at 11.  Each of the six categories of documents is discussed separately below.  The withholdings under Exemption 5 and the above privileges that DHS, CBP, and ICE have made from each of the categories are justified.

#### A.    THE WITHHOLDINGS OF DHS ARE JUSTIFIED

**1.**  Plaintiff challenges the reliance that DHS has placed on Exemption 5 and the deliberative process privilege to make withholdings from the *Civil Rights/Civil Liberties Impact Assessment: Border Searches of Electronic Devices* (Dec. 29, 2011) (DHS Office for Civil Rights and Civil Liberties (CRCL) Impact Assessment).  Pl. Mem. at 14.  Plaintiff's challenge to these withholdings is without merit.

The CRCL Impact Assessment had its genesis in August 2009, when the Secretary of Homeland Security "announced revised [ICE] and [CBP] policies with respect to searches of electronic devices in response to public and congressional concern, and as part of the continuing evolution of border security policy."  CRCL Impact Assessment, ECF No. 50-18, at 1.  "At the same time, the Secretary directed that CRCL assess the impact of these policies, to ensure that civil rights and civil liberties are appropriately addressed and to look for ways in which the new policies might be improved."  *Id.*  CRCL responded to the directive of the Secretary by "review[ing] the CBP and ICE policies guiding the border search of electronic devices; consult[ing] with CBP and ICE personnel to understand implementation of the policies and

ascertain how searches occur; and consider[ing] legal, policy, and practical concerns raised by advocacy groups and the public." *Id.*  The CRCL Impact Assessment "result[ed]."  *See id.*  The CRCL Impact Assessment begins with a discussion of "the process by which CBP refers travelers to secondary inspection," continues by "focus[ing] on the electronic device search policies and their implementation, describing the relevant legal authority and assessing the impact on individual rights," and concludes by "offer[ing] policy advice to Department and Component leadership about how to improve accountability, oversight, and notice about redress."  *Id.*

The withholdings that DHS has made from the CRCL Impact Assessment appear in the "section of the impact assessment . . . [that] examined the lawfulness of CBP and ICE policies concerning searches of electronic devices at the border and concluded the policies are lawful." Supp. Decl. of James V.M.L. Holzer (June 11, 2020) (2d Holzer Decl.), Ex. A hereto, ¶ 16.[1]  The portions of that section that DHS has withheld are "[t]hose portions . . . containing an analysis of the Department's legal authority in the context of the Agency's electronic device search policies and the implementation of those policies."  *Id.*  The same material was withheld when the CRCL Impact Assessment was published in 2013.  *Id.*

Plaintiff contends that "DHS's characterization of the withheld legal analyses as privileged is illogical" because DHS has released "the conclusions of those analyses" and other portions of the CRCL Impact Assessment.  Pl. Mem. at 15.  Plaintiff therefore opines that "[t]his stark inconsistency in applying the deliberative process privilege undermines DHS's claim to the privilege."  *Id.*  Plaintiff is mistaken.  "[A] FOIA case . . . [is] not an [Administrative Procedure Act (APA)] case."  *Brady Ctr. to Prevent Gun Violence v. Dep't of Justice*, 410 F. Supp. 3d 225,

---

[1] A table of exhibits appears at p.iii, *supra.*

241 (D.D.C. 2019).  Not only does "the APA's arbitrary and capricious standard" not apply to actions under FOIA but, "[t]o the contrary, nothing *in the FOIA* precludes agencies from releasing exempt records, and nothing *in the FOIA* requires that the agency adopt a consistent policy."  *Id.*  In addition, the release of a document to which the deliberative process privilege applies "only waives [the] privilege[] for the document or information specifically released, and not for related materials."  *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997); *see also Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (holding that "'a plaintiff asserting a claim of prior disclosure [in an action under FOIA] must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld'") (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).

Plaintiff also contends that DHS has failed to establish the applicability of the deliberative process privilege to the material it has withheld from the CRCL Impact Assessment because "[it] has failed to identify any decision to which the withheld information relates, and thus has failed to demonstrate that the information is predecisional."  Pl. Mem. at 15.  Plaintiff again is mistaken.  The deliberative process privilege "protects government documents that are both 'predecisional' and 'deliberative.'"  *Judicial Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017) (quoting *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 874 (D.C. Cir. 2010)).  "Documents are 'predecisional' if they are generated before the adoption of an agency policy,' and 'deliberative' if they 'reflect[] the give-and-take of the consultative process.'"  *Id.* (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006)).  The CRCL Impact Assessment "makes clear that its purpose is to 'offer[] policy advice to Department and Component leadership about how to improve accountability, oversight, and notice about redress.'"  Holzer Decl. ¶ 17 (quoting CRCL Impact Assessment at 1).  The CRCL Impact

Assessment also makes clear that that its recommendations are "intended as advice to the Secretary and '. . . do not purport to state the current position of the Department.'" *Id.* (quoting CRCL Impact Assessment at 4). The "legal opinions, recommendations, and preliminary ideas of agency counsel" that DHS has withheld from the CRCL Impact Assessment "formed part of the consultative process that led to the recommendations contained within the impact assessment." *Id.* That material "does not reflect final agency actions or policy" but instead "reflect[s] issues that authorities have determined to be, in their judgment, worthy of discussion or consideration by the Secretary in advance of a final agency decision." *Id.* The material that DHS has withheld from the CRCL Impact Assessment thus is both predecisional and deliberative and thus is covered by the deliberative process privilege.

**2.** Plaintiff also challenges the reliance that DHS has placed on Exemption 5 and the deliberative process privilege to withhold a "draft document, authored by an unidentified CRCL employee, [that] contains the employee's evaluation of and opinions about the effectiveness of DHS policies in safeguarding the rights of the public during searches of electronic devices at the border." Decl. of James V.M.L. Holzer (Jan. 31, 2020) (1st Holzer Decl.), ECF No. 46-3, Ex. A thereto at 15, *referred to in* Pl. Mem. at 13 & n.11. DHS has withheld this document in full. 2d Holzer Decl. ¶ 11. Plaintiff contends that DHS has failed to established the applicability of the deliberative process privilege to the document because it has failed to identify the "final policies or decisions[]"connected with the document. Pl. Mem. at 14. Plaintiff's contention is without merit.

The draft document that DHS has withheld is "internal briefing material authored . . . for the consideration of the DHS Secretary." 2d Holzer Decl. ¶ 11. It is one page in length. *Id.* Like the CRCL Impact Assessment, the draft document "was a part of the Agency's continuing

process of examining its policies guiding the border search of electronic devices, how searches occur, and related civil rights and civil liberties issues." *Id.*

The draft document "reflected the subjective observations, opinions, suggestions, and recommendations of CRCL personnel as to what the Secretary should take into consideration when deciding whether or not to modify current policies or procedures." 2d Holzer Decl. ¶ 11. "The employee who authored the [document] did not have the authority to make final agency decisions regarding policies and procedures on behalf of DHS, or an operational component, and the [document] did not reflect a final agency decision." *Id.* The document thus is both "pre-decisional and deliberative," *see id.*, and thus is covered by the deliberative process privilege.

**3.** Plaintiff challenges as an additional matter the reliance that DHS has placed on Exemption 5 and the deliberative process privilege to withhold a "memorandum from the DHS General Counsel [that] provides legal advice to the [DHS] Secretary for his consideration." 1st Holzer Decl., Ex. A thereto at 23, *referred to in* Pl. Mem. at 14 & n. 13. Plaintiff contends that DHS has failed to establish the applicability of the deliberative process privilege to the memorandum because it has failed to provide "any information about the content of this memorandum or any decision to which it related." Pl. Mem. at 14. This contention, too, is without merit.

The memorandum "is an internal DHS memorandum dated July 2, 2012, from the General Counsel to the Secretary." 2d Holzer Decl. ¶ 13. It is one page in length. *Id.* Authored "in response to the Secretary's [explicit] request for legal advice," the memorandum "reflected the subjective observations, opinions, suggestions, and recommendations of the General Counsel as well as information gathered by the General Counsel from the client agency." *Id.* ¶¶ 13, 15. DHS has withheld the memorandum in full. *Id.* ¶ 14.

The memorandum "was a part of the Agency's ongoing process of examining policies relative to the search of electronic devices at the border as well as associated litigation considerations." 2d Holzer Decl. ¶ 13. It deals in particular with "the potential impact of policy decisions on prior or anticipated litigation against the Agency arising from searches of electronic devices at the border." *Id*.¶ 15. The memorandum is both predecisional and deliberative and thus is covered by the deliberative process privilege.[2]

**4.** Plaintiff challenges as a final matter the reliance that DHS has placed on Exemption 5, the attorney-client privilege, and the work product privilege to withhold portions of certain emails "between attorneys with the DHS Office of the General Counsel (OGC) and the CBP Office of Chief Counsel (OCC)." 1st Holzer Decl., Ex. A at 8, *referred to in* Pl. Mem. at 18; *see* 2d Holzer Decl. ¶ 19. Plaintiff is wrong to do so.

Plaintiff contends that DHS has failed to establish the applicability of the attorney-client privilege to the emails because it has failed to demonstrate that the emails were "kept confidential." Pl. Mem. at 18. This contention is without merit. "The emails and draft documents included therein were legal in nature." 2d Holzer Decl. ¶ 21. "[C]onfidentiality was indeed expected in the handling of the records as evidenced by the fact the communications occurred only between attorneys from the Office of General Counsel at Headquarters and the Office of Chief Counsel and were marked 'Attorney Work Product/Attorney-Client Privileged.'" *Id.* "At the time of the communication[s] and since, confidentiality has been maintained." *Id.*

Plaintiff contends as a separate matter that DHS has failed to establish the applicability of the work product privilege to the emails because it has "not identif[ied] the author and origin of

---

[2] DHS has also withheld the memorandum under Exemption 5 and the attorney-client and work-product privileges. 1st Holzer Decl., Ex. A thereto at 23. Its withholding under those privileges is justified as well. *See* 2d Holzer Decl. ¶ 15.

any of the withheld information" and "[its] descriptions of the content of the [emails], and of the litigation in anticipation of which there were prepared, [is] so general as to be boilerplate." Pl. Mem. at 19. This contention likewise is without merit. The emails "total[] seventeen pages" and form an "email chain." 2d Holzer Decl. ¶¶ 19, 21. The emails "occurred on February 12 and 13, 2017." *Id.* ¶ 21. The attorneys who wrote the emails did so

> in response to a request from the Deputy Secretary to prepare legal analysis for the Secretary, and talking points for use by the Secretary during a scheduled meeting with the Attorney General, relative to the legal authorities surrounding technology at the border and legal and policy considerations associated with enhancements to agency practices.

*Id.* ¶ 19. DHS has not withheld the emails in full. *See id.* It instead has limited its withholdings from the emails to "those portions of the email chain containing draft language under consideration by agency counsel for inclusion in the memorandum [and] talking points." *Id.*

"To resolve . . . work product claims, [courts] ask 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 968 (D.C. Cir. 1999) (quoting *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 586 n.42 (D.C. Cir. 1987)). "[F]or a document to meet this standard, 'the lawyer must at least have had a subject belief that litigation was a real possibility, and that belief must have been objectively reasonable.'" *Id.* (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).

The emails meet that standard. The emails were written on February 12 and 13, 2017. *See* 2d Holzer Decl. ¶ 21. They thus were written following the adjudication of two actions challenging the constitutionality of searches of individuals' electronic devices at the border. The court had held in one of those actions that "the search and seizure of [the plaintiff's] laptop and other electronic devices was [not] so intrusive as to require any particularized suspicion." *House*

*v. Napolitano*, 2012 WL 1038816, at *7 (D. Mass. Mar. 28, 2012).  The court had held in the other action that "reasonable suspicion [was] not required to conduct a cursory manual search of an electronic device at the border."  *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 277 (E.D.N.Y. 2013)

Actions like *House* and *Abidor* would have made it reasonable for the attorneys from the Office of General Counsel and the Office of Chief Counsel tasked in 2017 with preparing briefing materials for senior officials "relative to the legal authorities surrounding technology at the border and legal and policy considerations associated with enhancements to agency practices," *see* 2d Holzer Decl. ¶ 19, to assume that additional actions in the same vein as *House* and *Abidor* were "'a real possibility.'"  *See Lutheran Soc. Servs.*, 186 F.3d at 968 (quoting *Sealed Case*, 146 F.3d at 884).  Any such assumption would have been prescient because another such action in fact was soon commenced.  *See Alasaad v. Nielsen*, 419 F. Supp. 3d 142, 168 (D. Mass. 2019), *appeal docketed*, No. 20-1077 (1st Cir. Jan. 28, 2020) (holding, in action commenced on September 13, 2017, and handled by the same district judge who handled *House*, that searches of electronic devices at the border that are not supported by "reasonable suspicion" violate the Fourth Amendment).  The "'prospect of litigation'" thus was sufficiently likely when the above emails were written, *see Lutheran Soc. Servs.*, 186 F.3d at 968 (quoting *Senate of P.R.*, 823 F.2d at 586 n.42), to bring the emails within the purview of the work product privilege.  The withholdings from the emails are therefore justified.[3]

---

[3] DHS has also relied on Exemption 5 and the deliberative process privilege as a basis for its withholdings from the emails.  1st Holzer Decl., Ex. A at 8; 2d Holzer Decl. ¶ 19.  The deliberative process privilege provides a justification for those withholdings as well.

**B.     THE WITHHOLDINGS OF CBP ARE JUSTIFIED.**

Plaintiff challenges the reliance that CBP has placed on Exemption 5 and the deliberative

process privilege to withhold, in full, "spreadsheets detailing border searches of electronic

devices."  Pl. Mem. at 15-16.  Plaintiff contends that the withholding of the spreadsheets is

unwarranted because CBP has "offer[ed] no explanation as to why this apparently factual

material should be withheld due to the deliberative process privilege; it does not even assert that

the information is pre-decisional."  *Id*. at 16.

Plaintiff's contention is without merit.  "[T]he 271 pages of spreadsheets and related

statistical analysis withheld by CBP were obtained, compiled, or created by CRCL in relation to

their review of CBP law enforcement activities, including activities relating to border searches of

electronic devices."  Decl. of Patrick A. Howard (June 11, 2020) (2d Howard Decl.), Ex. B

hereto, ¶ 10.  The 271 pages contain "CBP information [that] was disclosed to inform CRCL's

review and analysis of CBP activities," *id.*, and "reflect the ongoing exchange of information

between CBP and CRCL to allow CRCL to gain information about CBP's policies, with the

anticipation of further policy recommendations to agency leadership."  *Id*. ¶ 12.  "These records

were created for the specific purpose of evaluating whether changes to policies might be

necessary and to make recommendations to agency leadership regarding potential changes to

those policies."  *Id*.  Put another way,

> the spreadsheets and analyses were developed in the course of DHS's internal,
> predecisonal deliberations regarding the conduct of border searches of electronic
> devices and to inform policymakers on whether to make recommendations to
> departmental decision makers regarding the need for prospective policy changes
> to improve oversight over border searches of electronic devices.

*Id.* ¶ 13.  The spreadsheets and analyses thus are both predecisional and deliberative, and thus are

covered by the deliberative process privilege

C.    THE WITHHOLDINGS OF ICE ARE JUSTIFIED.

Plaintiff challenges the reliance that ICE has placed on Exemption 5, the deliberative

process privilege, the attorney-client privilege, and the work product privilege to withhold "a

document titled 'computer border search discussion topics'" and "documents containing 'DOJ's

questions relating to DHS's border search authority.'"  Pl. Mem. at 15, 18-19.  These documents

are fewer than plaintiff suggests.  "The withheld material consists of an undated six-page

memorandum entitled 'Computer Border Search Discussion Topics' and an undated six-page

draft of the memorandum."  Supp. Decl. of Toni Fuentes (May 26, 2020) (2d Fuentes Decl.), Ex.

C hereto, ¶ 5.

Plaintiff contends that ICE has failed to establish the applicability of the deliberative

process privilege to the memorandum because it has "not identif[ied] the policy or decision in

support of which the document was prepared."  Pl. Mem. at 15.  This contention is without merit.

"The memorandum was prepared in [the] aftermath of the conclusion of proceedings in *United

States v. Kim*, 103 F. Supp. 3d 32 (D.D.C. 2015)."  2d Fuentes Decl. ¶ 5.  *Kim* was a criminal

action "involving the enforcement of export control laws and the trade embargo with Iran."  103

F. Supp.3d at 34.  The defendant in *Kim* moved to suppress evidence "harvested" by agents of

Homeland Security Investigations (HSI), a component of ICE, from a laptop "seized from [the

defendant] when he was departing the country through Los Angeles International Airport."  *Id.*

The search of the laptop was not one in which "[someone] simply turned [the laptop] on and

perused the files as might have been possible at the border" but one in which "an exact copy of

the hard drive [was made] and retain[ed] . . . so that it could be subjected to a series of searches,

using whatever software investigators deemed necessary, for a period of unlimited duration."  *Id.*

at 52.  Holding that the "imaging and search of the entire contents of [the] laptop" was

"unreasonable" under "the totality of the unique circumstances of this case," the court granted the motion to suppress by memorandum opinion and order dated May 8, 2015. *Id.* at 59.

"Following the decision in the *Kim* case, DOJ and DHS and its components met to discuss the best litigation approach in anticipation of future lawsuits." 2d Fuentes Decl. ¶ 6. "In advance of meeting with DHS and its agency counsels, DOJ solicited information from DHS to decide on mutually agreeable litigation strategies." *Id.* "The memorandum was prepared for and provided to a senior DHS decision maker in anticipation of the scheduled meeting with DOJ." *Id.* "This memorandum was also provided to DOJ before the anticipated meeting with DHS." *Id.*

The memorandum "contains legal opinions, recommendations, and preliminary views of ICE and other DHS agency counsels, which formed part of the consultative process regarding the recommended most effective litigation strategies and legal authorities supporting them that led [to] the responses provided to DOJ's questions." 2d Fuentes Decl. ¶ 7. The memorandum "does not reflect a final agency position regarding the litigation strategy to adopt in future cases as this position was still evolving at the time of these discussions." *Id.* "Instead, it reflects the issues that agency counsels [had] determined to be, in their judgment, worthy of discussion with or consideration by DOJ attorneys prior to DHS adopting [a] final decision regarding the legal strategy to pursue in the future." *Id.* The memorandum thus is both predecisional and deliberative and thus is covered by the deliberative process privilege. The protection of the privilege extends as well to the draft of the memorandum. *See Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258-59 (D.C. Cir. 1982) (holding that drafts are covered by the deliberative process privilege where, as here, they are "part of a predecisional deliberative process").

Plaintiff contends as a separate matter that ICE has failed to establish the applicability of the attorney-client privilege to the memorandum because it has failed to demonstrate that it was "kept confidential."  Pl. Mem. at 18.  This contention is without merit.  The memorandum, as discussed above, "was prepared in anticipation of further discussions between DOJ attorneys who represented DHS in lawsuits, and DHS agency counsels pertaining to litigation strategies involved in DHS border search authorities."  2d Fuentes Decl. ¶ 8.  The memorandum "was only intended to be seen by counsel for DOJ and DHS, and ICE has no reason to believe it was disseminated beyond the DOJ and DHS attorneys involved in these discussions and with a need to know."  *Id.*

Plaintiff contends as a further matter that ICE has failed to establish the applicability of the work product privilege to the memorandum because it has failed to identify the "author and origin" of the memorandum or to provide an adequate description of its contents and of "the litigation in anticipation of which [it was] prepared."  Pl. Mem. at 19.  That contention is baseless in view of ICE's explanation that "the decision in the *Kim* case" led to the creation of the memorandum "by agency counsel in anticipation of and in preparation for future litigations in federal courts, specifically, legal challenges to DHS border search authorities."  2d Fuentes Decl. ¶¶ 6, 12.  The memorandum is therefore covered by the work product privilege.

## II.   THE WITHHOLDINGS UNDER EXEMPTION 7(C) THAT PLAINTIFF CHALLENGES ARE JUSTIFIED.

The sole withholdings under Exemption 7(C) that plaintiff continues to challenge are certain of the withholdings that CBP has made of "information about travelers who were subjected to electronic device searches from [Electronic Media Reports (EMRs)]."  Pl. Mem. at 20.  Plaintiff also challenges the withholdings that CBP allegedly has made of "information about travelers who were subjected to electronic device searches from . . . spreadsheets

summarizing data relating to those searches," *id.*, but CBP has not relied on Exemption 7(C) to withhold information of that type from "aggregate or statistical information unconnected with a specific law enforcement inspection on a particular day."  2d Howard Decl. ¶ 23.

Plaintiff challenges the withholdings that CBP has made from the EMRs on two grounds. The first is that disclosure of the withheld information is insufficiently likely to invade the personal privacy of the individuals to whom it pertains to bring it within the purview of Exemption 7(C).  Pl. Mem. at 21. The second is that the public interest favors disclosure of the information.  *Id.*  Plaintiff is wrong on both scores.

A.  **DISCLOSURE OF THE WITHHELD INFORMATION IS SUFFICIENTLY LIKELY TO INVADE THE PERSONAL PRIVACY OF THE INDIVIDUALS TO WHOM IT PERTAINS TO BRING IT WITHIN THE PURVIEW OF EXEMPTION 7(C).**

"Each time a CBP officer conducts a border search of an electronic device, an EMR is created to document the search."[4]  2d Howard Decl. ¶ 16.  "EMRs include multiple standard fields and a narrative description of the border search."  *Id.*  EMRs thus contain "a great deal of information regarding the traveler which, individually and/or taken together, can lead to identification of the subject of the [EMR]."  *Id.*

The following information may appear in an EMR:

- the date and time of the search to which the EMR pertains;

- the traveler's name;

- the traveler's date of birth;

- the traveler's passport number;

- the traveler's ethnicity;

---

[4] EMRs are "also known as Inspection of Electronic Media (IOEM) records," 2d Howard Decl. ¶ 15, and were referred to earlier in this case as "incident-level reports."  E.g., 5th Jt. Stat. Rep. (Jan. 16, 2018), ECF No. 26, at 3.

- the traveler's race;

- the traveler's gender;

- the traveler's country of birth;

- the traveler's citizenship;

- the traveler's occupation;

- the traveler's education;

- the purpose of the traveler's trip;

- the traveler's plans upon entry to the United States;

- the duration of the traveler's trip;

- details regarding the traveler's foreign travel;

- whether the individual had a travel companion;

- whether the traveler was cooperative;

- specific descriptions of the electronic devices carried by the traveler.

*See* 2d Howard Decl. ¶¶ 17, 19, 24-26.

CBP has produced "thousands of EMRs" in this case. Pl. Mem. at 27. CBP has disclosed certain categories of information from the EMRs, "includ[ing] the date and time of the search, along with the gender and race of the individual," 2d Howard Decl. ¶ 26, but has withheld "any information that could be used to identify the subject of the record." *Id.* ¶ 22. CBP has withheld that information pursuant to Exemptions 6 and 7(C). *Id.* Plaintiff does not challenge the reliance that CBP has placed on Exemption 7(C) to withhold information from the EMRs that plaintiff considers to be "*actually* personally identifying, such as names, addresses, and social media handles." Pl. Mem. at 22 n.36. Plaintiff contends instead that its decision not to challenge CBP's withholding of the above information renders unjustifiable any other

withholdings under Exemption 7(C) that CBP has made from the EMRs because the "odds" that

the withheld information "[could] be tied to any person, even in context, are vanishingly small."

*Id.* at 22.

Plaintiff is mistaken. "CBP conducts border searches of electronic devices" with

"relative infrequency." 2d Howard Decl. ¶ 19. "In fiscal year 2017, for example, approximately

0.007 percent of the approximately 397 million arriving international travelers processed by CBP

officers had their electronic devices searched." *Id.* As a result,

> if CBP were to disclose more biographical information regarding individuals
> subject to device searches, it would be relatively easy for a third party to review
> searches that meet certain criteria (e.g., the search[] occurred on a certain date,
> involved an individual of a certain ethnicity or country of birth, and the individual
> had a certain occupation) and isolate searches of interest from the limited universe
> of CBP device searches.

*Id.* "The information from [the EMRs] could then be correlated against other available

information – either publicly known or known to the third party – to identify the subject of the

search and tie that person to the CBP record, without his or her authorization or consent." *Id.*

"This would reveal not only that the individual was subject to a border search of an electronic

device, but also any other unredacted personal details contained in the record (including, for

example, whether the individual has a travel companion or whether the individual was

cooperative)." *Id.*

"[I]nformation available to anyone" under FOIA "is available to everyone" because

FOIA "requires that non-exempt files be disclosed to 'any person.'" *Nat'l Ass'n of Retired Fed.*

*Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) (quoting the predecessor of 5 U.S.C.

§ 552(a)(3)(A)). *Id.* The following "hypothetical example[s]" show how "*members of the public*

would be able to identify the subjects" of the EMRs that CBP has produced, "even if *the*

*plaintiffs* could not," if CBP "were to disclose more biographical information regarding [those]

individuals":

- "[A] reference [in an EMR] to an accountant whose country of origin is Italy whose device was searched on a particular date after a two-week trip to Japan may not appear on its face to reveal the identity of the individual, but there is a substantial likelihood that his friends, neighbors, and students would recognize the description."  2d Howard Decl. ¶¶ 19-20.

- [I]t would be easy for a student who knew basic information about his professor, like gender and the approximate date of international travel, to ascertain that the [EMR] which references a female-professor from Spain with two children who teaches anthropology is his professor at the university he attends."  *Id.* ¶ 26.

- "[I]f a traveler complained to his neighbor that his device had been searched upon his return from an international vacation on a certain date, the neighbor could check the EMRs by date to see if she could find one that seemed to meet the description of her neighbor.  If the information CBP withheld pursuant to [Exemption 7(C)] were revealed, she could identify her neighbor's record.  Based on the information that was left unredacted and other factors, she [might] draw conclusions – warranted or unwarranted – about her neighbor or view him in a different light."  *Id.*

FOIA contains two privacy exemptions, Exemptions 6 and 7(C).  Those exemptions are

"directed to threats to privacy interests more palpable than mere possibilities."  *Dep't of the Air*

*Force v. Rose*, 425 U.S. 352, 380 n.19 (1976) (Exemption 6); *see Pub. Citizen Health Rsrch.*

*Grp. v. Acosta*, 363 F.3d 1, 16 (D.D.C. 2018) (same; Exemption 7(C)).  Such threats exist here,

as the above examples show, notwithstanding plaintiff's acquiescence in CBP's withholding

information pursuant to Exemption 7(C) that plaintiff considers to be "*actually* personally

identifying."  *See* Pl. Mem. at 22 n.36.  The existence of those threats requires the Court "to

balance the . . . privacy interest[s]" of the individuals to whom the withheld information pertains

"against the public interest in disclosure."  *NARA v. Favish*, 541 U.S. 157, 171 (2004).  The

balancing process does not favor disclosure, as the following discussion shows.

**B.  THE PUBLIC INTEREST DOES NOT FAVOR DISCLOSURE OF THE WITHHELD INFORMATION.**

Plaintiff contends that the public interest favors disclosure of the information that CBP has withheld from the EMRs under Exemption 7(C), other than the information that plaintiffs considers to be "*actually* personally identifying," because "CBP cannot demonstrate" that "the privacy interests at stake . . . outweigh the public interest in disclosure."  Pl. Mem. at 21. Plaintiff gets the burden of proof wrong, however.  Where, as here, "the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure." *Favish*, 541 U.S. at 172.

The public interest in disclosure that plaintiff identifies is the public interest in the government's "suspicionless searches of electronic devices at the border."  Pl. Mem. at 23.  More particularly, plaintiff points to the public interest in CBP officers' alleged "targeting [of] journalists and Muslims, including Muslim Americans, in exercising their broad discretion to conduct these invasive searches." *Id.*  In asserting a public interest based on agency misconduct, it is not enough, however, for the requester merely to allege a possibility of agency misconduct. Rather, an agency may withhold information identifying private citizens in law enforcement records, as CBP has done here, "unless disclosure is 'necessary to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker v. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)).  The requester must also show that disclosure "is likely to advance" the alleged "reason for the disclosure." *See Favish*, 541 U.S. at 172.

Plaintiff points to no "compelling evidence" that any such targeting has taken place. Plaintiff points to a press release and three news stories, Pl. Mem. at 23-24 (citing Pl. Statement Pursuant to LCvR 7(h)(1) (Mar. 30, 2020), ECF No. 48-2, ¶ 5), but none of them constitutes such

evidence.  The press release is dated January 18, 2017.  Pl. Statement Pursuant to LCvR 7(h)(1),

¶ 5.  An advocacy group announces in the press release that it has filed 10 complaints with CBP

"on behalf of Muslim-Americans whose devices CBP had searched."  *Id.*  The mere filing of the

complaints is not evidence, however, that the challenged searches were conducted because the

individuals whose devices were searched were Muslim-American.

    The news stories likewise fail to show that CBP has engaged in any targeting of any

group in which plaintiff proclaims an interest.  The first story is dated December 9, 2016.  Pl.

Statement Pursuant to LCvR 7(h)(1), ¶ 5.  The story allegedly reports that "border officers . . .

subjected Isma'il Kushkush, a former acting bureau chief of the *New York Times* in East Africa,

to an electronic device search [in] January 2016 while interrogating him regarding his reporting

on refugees."  *Id.*  The second story is dated July 21, 2016.  *Id.*  The story allegedly reports that

"border officers . . . detained Maria Abi-Habib, a reporter for the *Wall Street Journal*, and

attempted to confiscate her cell phones, which contained confidential source information."  *Id.*

The third story is dated March 6, 2019.  Pl. Mem. at 24.  The story allegedly shows that the

government "over time . . . has . . . exercised is claimed border search authority to detain and

search more journalists, as well as activists and attorneys."

    These stories suffer from four defects as evidence, let alone "'compelling evidence,'" that

CBP "engage[s] in illegal activity.'"  *See Schrecker*, 349 F.3d at 661 (quoting *SafeCard*, 926

F.2d at 1206).  First, the stories are "inadmissible hearsay."  *Zaidan v. Trump*, 317 F. Supp. 3d 8,

14, 19 n.1 (D.D.C. 2018) (so holding with respect to an article in the *Washington Post* reporting

that the listing of an individual "in a U.S. intelligence document called SKYNET, which

identified potential terrorists" could "lead to results other than death, such as capture and

interrogation or rendition").  Second, the stories, even if true, provide too few data points over

too long a period of time to establish that CBP officers are targeting journalists, Muslims,

activists, or attorneys when they conduct searches of electronic devices at the border.  Third,

certain of those data points fall outside the time frame (July 16, 2016-January 16, 2018) covered

by the EMRs that CBP has produced in this case.  Fourth, the mere fact that a journalist, a

Muslim, an, activist, or an attorney has experienced a search of his or her electronic device in no

way establishes that the search was conducted unlawfully.

Plaintiff has not shown, moreover, that disclosure of the withheld information would be

"likely to advance" the "reason for the disclosure" that plaintiff has enunciated.  *See Favish*, 541

U.S. at 172.  Nor can plaintiff make any such showing.  The EMRs that CBP has produced in

this case are "a 2% sample of the incident-level reports dealing with border searches of

electronic devices created during the . . . 18 months [preceding January 16, 2018]."  5th Jt. Stat.

Rep. (JSR) (Jan. 16, 2018), ECF No. 26, at 4.  No reason exists to believe that this sample

necessarily includes searches of electronic devices transported by journalists, Muslims, activists,

or attorneys.  Disclosure of the withholdings under Exemption 7(C) that plaintiff challenges thus

would result in the likely disclosure of personal-privacy information pertaining to numerous

individuals in whom plaintiff has expressed no interest.  No such disclosure should therefore be

required.

## III.   THE WITHHOLDINGS UNDER EXEMPTION 7(E) THAT PLAINTIFF CHALLENGES ARE JUSTIFIED.

### A.   THE WITHHOLDINGS OF CBP ARE JUSTIFIED.

Plaintiff challenges the reliance that CBP has placed on Exemption 7(E) to withhold three

categories of information.  Pl. Mem. at 27.  Plaintiff's challenges lack merit as to all three

categories.

1.       Plaintiff challenges as a threshold matter the reliance that CBP has placed on Exemption 7(E) to withhold "information recording the reasons for each traveler's search."  Pl. Mem. at 27.  CBP's withholding of that information is justified, however, in view of what happens at the border.  "Upon arrival in the United States, individuals are generally required to present themselves to CBP at the port of entry's primary arrival location."  2d Howard Decl. ¶ 30.  This encounter is "often referred to as 'primary' or 'primary inspection.'"  *Id.*  CBP officers "use the available information and their extensive training and experience to identify situations [at primary] that warrant additional scrutiny."  *Id.*  "If the CBP [o]fficer at primary determines that additional scrutiny is appropriate (for example, to address concerns related to admissibility, customs, national security and/or agricultural laws or other laws enforced or administered by CBP), the traveler may be referred for a continuation of the inspection."  *Id.* The continuation of the inspection is "often referred to as 'secondary' or 'secondary inspection.'" *Id.*

"TECS is CBP's principal law enforcement and counterterrorism database system used at the border to assist with inspections and determinations regarding admissibility of arriving persons."  2d Holzer Decl. ¶ 31.  "CBP officers use TECS at the border to document inspections and to identify whether there are any relevant 'lookouts' in the [TECS] system to advise officers that additional scrutiny may be warranted."  *Id.*

"CBP exists . . . [t]o safeguard America's borders thereby protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness by enabling legitimate trade and travel."  CBP, *About CBP*, https://www.cbp.gov/about (accessed Apr. 21, 2020), Ex. D hereto, at 1.  "Normally, over one million travelers per day go through U.S. ports of entry."  2d Howard Decl. ¶ 30.  "The sheer volume of people and merchandise

21

passing through the border every day" means that a CBP officer "has a limited amount of time to

determine the specific law enforcement actions appropriate for each encounter," even with the

help of TECS.  *Id.* ¶ 31.  Thus, "[e]ven though the regulations authorize [device] searches to take

place without reasonable suspicion . . . 'as a matter of commonsense and resources, it is only

when a reasonable suspicion is aroused that such searches will take place.'"  *Abidor*, 990 F.

Supp. 2d at 272 (quoting *United States v. Cotterman*, 709 F.3d 952, 967 n.14 (9th Cir. 2013)).

CBP officers therefore "take a holistic approach that accounts for the totality of the

circumstances in order to properly evaluate and assess the people and goods that seek to cross the

border."  2d Howard Decl. ¶ 31.  "Every aspect of the determination of when to refer a traveler

for additional scrutiny, and what specific actions should be taken during a border inspection"

thus "reflect the methods, techniques, and procedures that CBP officers are trained to undertake."

*Id.*

      The searches of electronic devices at the border that CBP conducts serve many

purposes:

- "They help detect evidence relating to terrorism and other national security matters, human and bulk case smuggling, contraband, and child pornography."

- "They can . . . reveal information about financial and commercial crime, such as those relating to copyright, trademark, and export control violations."

- "They can be vital to risk assessments that otherwise may be predicated on limited or no advance information about a given traveler or item."

- "[T]hey can enhance critical information sharing with, and feedback from, elements of the federal government responsible for analyzing terrorist threat information."

- "[They] are often integral to a determination of an individual's intentions upon entry and provide additional information relevant to admissibility under the immigration laws."

CBP, *Border Searches of Electronic Devices*, CBP Dir. No. 3340-049A (Jan. 4, 2018), Ex. E hereto, § 1. "While travelers are generally obligated to present themselves [to CBP] for inspection, only a fraction of a percent have their [electronic] devices searched." 2d Howard Decl. ¶ 33. Disclosing "the specific reasons for specific searches on specific dates at specific times" would therefore "disclose[] CBP priorities and how CBP conducts risk assessments in utilizing its finite resources." *Id.*

      The adverse effects of any such disclosure would be magnified by "the volume of records at issue" in this case and thus by the aggregate information disclosed. 2d Howard Decl. ¶ 34. EMRs "include a narrative section describing each part of the border inspection, including where relevant and appropriate, the specific reasons a device [was] searched." *Id.* ¶ 33. The disclosure of the narrative sections of all of the EMRs that CBP has produced in this case thus "would provide a basis for comparison of the handling of different inspections, which would reveal the nature and extent of the government's law enforcement interest in particular situations and allow for comparisons based on various factors." *Id.* ¶ 34. "This could lead those who seek to circumvent the law to adjust their behavior with the goal of decreasing the likelihood that their device [would] be searched at the border." *Id.* "Specifically, [such individuals] could gauge how often searches are conducted for particular reasons, which would enable them to obfuscate the purpose for their travel or assess the likelihood that a traveler with a specific type of background would be subject to search." *Id.*

      The "public release of the reasons for a search on a specific date and time" would also inform the subject of a search of "the reason [his or her] specific device was search[ed]." 2d Howard Decl. ¶ 34. "This would reveal the nature of law enforcement interest in that traveler, which could reveal information about on-going investigations and inquiries." *Id.* "It could also

lead the traveler to take evasive actions to avoid future search, including for example by asking a co-traveler to carry [his or her] devices or surreptitious deletion of data resident on devices during an inspection." *Id.*

An agency relying on Exemption 7(E) as a basis for withholding "only needs to 'demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law.'" *Shapiro v. Dep't of Justice*, 893 F.3d 796, 800 (D.C. Cir. 2018) (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)). "This is 'a relatively low bar.'" *Id.* (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). An agency clears that bar by showing that releasing the requested information "could provide information . . . that would potentially allow a criminal to deploy countermeasures to 'throw [the agency] off their trail.'" *Id.* at 801. CBP has made that showing here. The reasons why particular searches of electronic devices have taken place are therefore properly protected under Exemption 7(E)

**2.** Plaintiff also challenges the reliance that CBP has placed on Exemption 7(E) to withhold "information recording . . . whether [a] traveler was notified of the search, whether they were provided with a tear sheet, and if not, why the tear sheet was not provided." Pl. Mem. at 27. This challenge is unwarranted as well.

"Tear sheets" are the product of an elaborate statutory and regulatory scheme. The Commissioner of CBP is required by statute to establish "standard operating procedures for searching, reviewing, retaining, and sharing information contained in communication, electronic, or digital devices encountered by [CBP] personnel at United States ports of entry." 6 U.S.C. § 211(k)(1)(A). The standard operating procedures must require, "in the case of a search of information conducted on an electronic device by [CBP] personnel, the Commissioner to notify the individual subject to such search of the purpose and authority for such search, and how such

individual may obtain information on reporting concerns about such search."  *Id.* § 211(k)(2)(A).

The Commissioner is permitted to withhold the notification, however, "if the Commissioner

determines, in the sole and unreviewable discretion of the Commissioner, that such notification[]

would impair national security, law enforcement, or other operational interests."  *Id.* § 211(k)(3).

The required standard operating procedure provided as follows during the period August

20, 2009-January 4, 2018:

> When a border search of information is conducted on an electronic device, and
> when the fact of conducting this search can be disclosed to the individual
> transporting the device without hampering national security or law enforcement or
> other operational considerations, the individual may be notified of the purpose
> and authority for these types of searches, how the individual may obtain more
> information on reporting concerns about their search, and how the individual may
> seek redress form the agency if or she feels aggrieved by a search.

*Border Searches of Electronic Devices*, CBP Dir. 3340-049 (Aug. 20, 2009), ECF No. 18-2,

§ 5.3.1.3.  The standard operating procedure has provided as follows since that time:

> When a border search of information is conducted on an electronic device, the
> individual subject to search will be notified of the purpose and authority for such
> search, how the individual may obtain more information on reporting concerns
> about the search, and how the individual may seek redress from the agency if he
> or she feels aggrieved by a search.  If the Officer or other appropriate CBP official
> determines that the fact of conducting this search cannot be disclosed to the
> individual transporting the device without impairing national security, law
> enforcement, officer safety, or other operational interests, notification may be
> withheld.

CBP Dir. No. 3340-049A, § 5.4.1.3.  A leaflet, called a "tear sheet," CBP, *Inspection of*

*Electronic Devices*, https://www.cbp.gov/sites/default/files/documents/inspection-electronic-

devices-tearsheet.pdf, Ex. F hereto, is the form of notification that CBP provides to an individual

whose electronic device has been searched.

"[T]he subject of a search" may be able to "deduce," as explained above, that a

particular EMR "pertains to his or inspection based on the information [in the EMR] that is

disclosed, which generally includes the date and time and other details relating to the inspection." 2d Howard Decl. ¶ 38. Disclosure of the fact that a particular individual was not notified of his or her inspection would permit that individual to infer from the applicable standard operating procedure "that CBP withheld the notification because CBP determined it would impair national security, law enforcement, officer safety, or other operational interests." *Id.* "This would tend to disclose the nature of the Government's interest in the individual as CBP generally withholds the notification only in certain circumstances." *Id.* "This [might], in turn, lead the individual to take additional steps to conceal harmful or illicit material and frustrate future investigative efforts." *Id.*

The above possibility is yet another instance in which the release of requested information "could provide information . . . that would potentially allow a criminal to deploy countermeasures to 'throw [the agency] off their trail.'" *See Shapiro*, 893 F.3d at 801. The reliance that CBP has placed on Exemption 7(E) to withhold "information recording . . . whether [a] traveler was notified of the [traveler's] search, whether they were provided with a tear sheet, and if not, why the tear sheet was not provided," *see* Pl. Mem. at 27, is therefore justified.

**3.** Plaintiff challenges as a final matter the reliance that CBP has placed on Exemption 7(E) to withhold, from certain spreadsheets, "tallies of device searches and tables showing searches of travelers based on certain demographic information." Pl. Mem. at 27. Plaintiff likewise challenges the reliance that CBP has placed on Exemption 7(E) to withhold, from "records containing communications about CRCL's Impact Assessment . . . the 'findings' column within a table summarizing CRCL's findings and CBP's recommendations to address those findings." *Id.* at 33.

Plaintiff's challenge to these withholdings is unwarranted.  The challenged withholdings consist of "aggregate statistics from spreadsheets and reports regarding border searches of electronic devices to the extent such statistics tend to disclose CBP's law enforcement techniques, procedures, and guidelines, and disclosure would risk circumvention of the law."  2d Howard Decl. ¶ 41.  Multiple scenarios exist under which disclosure of the statistics could "risk circumvention of the law."  *See id.*  Disclosure, for example, "of the relative frequency with which devices are searched at each port of entry" might "provid[e] illicit actors the opportunity to identify differences between different locations and modify their behavior accordingly at a particular port or choose to travel through a specific port."  *Id.*  "[R]evealing aggregate statistics about the nationality of travelers who have devices that are subject to a border search" might also "provide insight into non-public sources of information and methodologies used by CBP in performing its law enforcement and border security duties."  *Id.*  A disclosure, for example, that the electronic devices of "a high number of individuals of a certain nationality . . . were searched on days that correspond to a flight from that country that lands at a particular airport [might] reveal the existence of an ongoing operation at that airport."  *Id.*  Such a disclosure could "pose[] a risk of circumvention of the law by providing potential adversaries the ability to identify circumstances in which a device search [might] be more or less likely, or by revealing the capabilities of vulnerabilities of CBP inspection techniques."  *Id.*

These possibilities are still another instance in which in which the release of requested information "could provide information . . . that would potentially allow a criminal to deploy countermeasures to 'throw [the agency] off their trail.'"  *See Shapiro*, 893 F.3d at 801.  The reliance that CBP has placed on Exemption 7(E) to withhold the "aggregate statistics from [the] spreadsheets and reports," *see* 2d Howard Decl. ¶ 41, is therefore justified.

### B.     THE WITHHOLDINGS OF ICE ARE JUSTIFIED.

Plaintiff challenges the reliance that ICE has placed on Exemption 7(E) to withhold

material from "sections of its internal handbooks and guidebooks." Pl. Mem. at 32. Plaintiff

contends that the withholding of this material is unwarranted because the material consists of

"legal analysis and discussion rather than the type of confidential technical procedures

Exemption 7(E) was designed to protect." *Id.* at 33. This contention is without merit.

The challenged withholdings consist of material withheld from "HSI internal

handbooks." 2d Fuentes Decl. ¶ 13. This material "[does] not contain legal analysis and

discussions as these internal handbooks were prepared to assist HSI agents in developing

techniques to investigate criminal activities and to provide guidelines that the agents could refer

to." *Id.* "Although . . . the techniques and guidelines might be known to the public, the

method[s] in which agents use[] these techniques and guidelines to conduct their investigations

are unknown to the public." *Id.* ¶ 18.

The withheld material falls into four categories. 2d Fuentes Decl. ¶¶ 14-17. The first

category consists of material withheld from the "section relating to 'Consent'" in the "internal

HSI handbook titled 'Computer Forensics Handbook.'" *Id.* ¶ 14. "This section of the internal

handbook provides guidelines and techniques to the special agents for when a search is

warranted with or without consent." *Id.* "This section also provides guidance and instructions

pertaining to various scenarios involving agents conducting searches at the border." *Id.*

"Disclosure of this information would allow bad actors to evade and circumvent the law by

interfering with techniques agents use to conduct a search." *Id.*

The second category of withheld material consists of material withheld from the sections

captioned "Administrative Searches," "Functional Equivalent of the Border," and "Extended

Border" in the "internal HSI handbook titled 'Search and Seizure Handbook.'"  2d Fuentes Decl.

¶ 15.  "The redacted sections of this handbook provide guidance to agents" regarding the

following:

> (1) the types of allowable administrative searches to be conducted and when the agents are permitted to conduct searches without warrants; (2) the types of circumstances allowing for border nexus to be qualified as an equivalent of the border and (3) limitations on 'Functional Equivalent of Border [S]earches . . . and situations when border searches [may be] conducted away from the actual border, such as extended border.

*Id.*  "The withheld information in this internal handbook provide[s] law enforcement techniques

and guidelines to special agents at the border to determine when a search of an electronic

device[] [is] warranted."  *Id.*  This information merits withholding because its disclosure "would

allow the human traffickers or drug smugglers [to] know the circumstances under which they

may be subject to a search at or near the border, allowing them to change their tactics because

they know the techniques in which the agents conduct searches the border."  *Id.*

The third category of withheld material consists of material withheld from the sections

captioned "Search Warrant," "Title III Court Order," "Investigative Protocols and Precautions

Regarding Wireless Networks," "Guidelines for Searching and Seizing Digital Devices," and

"Judicial Responsibility" in the "internal HSI handbook" entitled "Child Exploitation

Handbook."  2d Fuentes Decl. ¶ 16.  This material consists of

> information relating to (1) when a search warrant is required; (2) when to request a warrant for a Title III Court Order, (3) investigative protocols relating to wireless networks while executing a search warrant, and (4) techniques, protocols, and guidelines the Special Agents are required to follow in searching electronic communications in relation to their investigation of targets involving child sexual exploitation.

*Id.*  This material merits withholding because its disclosure "would reveal guidelines and

techniques the agents use in battling child sexual exploitation," thereby allowing pedophiles to

"alter their strategies in targeting young children online by evading how agents conduct their investigations."  *Id.*

The final category of withheld material consists of material withheld from the internal HSI handbook entitled "National Security Investigation Handbook."  2d Fuentes Decl. ¶ 17. Certain of this material comes from the section of the handbook entitled "FISA Application in Lone Wolf Situations."  *Id.*  This material "is protected because it contains techniques, protocols, and guidelines the Special Agents are required to follow when searching for relevant electronic communications of the targets of those investigations."  *Id.*

The remainder of the withheld material comes from the section of the handbook "relating to 'Joint Terrorism Task Force Participation."  2d Fuentes Decl. ¶ 17.  This material "contains information relating [to] how HSI cooperates with the Federal Bureau of Investigation (FBI) when conducting operational oversight and investigations into terrorist groups and their activities."  *Id.*  The material merits withholding because its disclosure "would allow members of a terrorist group to evade law enforcement investigations because they [had] learned how [Joint Terrorism Task Force] agents gather information on them and what role ICE plays in gathering information regarding their activities."  *Id.*  This material also merits withholding because its disclosure could tell "a potential active shooter . . . how law enforcement agents can become privy to his/her activities and by knowing these techniques and guidelines, take[] extra steps to avoid such law enforcement activities."  *Id.*

A law enforcement agency may withhold "non-public portions of its Agents' Manual under Exemption 7(E)" if the agency "adequately demonstrate[s] that the release of this information 'might increase the risk that a law will be violated or that past violators will escape legal consequences.'"  *Djenasevic v. Exec. Office for U.S. Att'ys*, 2019 WL 5390964, at *1 (D.C.

Cir. Oct. 3, 2019) (quoting *Pub. Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 205 (D.C. Cir. 2014)).  ICE has made that demonstration here.  Its reliance on Exemption 7(E) to withhold material from its HSI internal handbooks is therefore justified.

## IV.     THE DHS AND ICE DECLARATIONS AND *VAUGHN* INDICES COVER ALL RECORDS THAT REQUIRE COVERAGE.

### A.     THE DHS DECLARATIONS AND *VAUGHN* INDICES COVER ALL RECORDS THAT REQUIRE COVERAGE.

Plaintiff contends that DHS' initial declaration and *Vaughn* index are "incomplete" because they do not "provide any justification for [DHS'] withholding of certain records."  Pl. Mem. at 40.  Plaintiff points to four records or groups of records in making that contention.  *See id.* at 40 n.50.  All DHS records that require coverage are covered, however, by DHS' initial and supplemental declarations and *Vaughn* indices.

**1.**  Plaintiff contends that DHS' initial *Vaughn* index is incomplete because it does not address certain enumerated records bearing Bates numbers beginning with the prefix "DHS-001-00513-."  Pl. Mem. at 40 n.50.  This contention is without merit because DHS did not release any documents in this case bearing Bates numbers beginning with that prefix and thus did not withhold any information from any such documents.  2d Holzer Decl. ¶ 8 & n.1.

**2.**  Plaintiff contends that DHS' initial *Vaughn* index is incomplete because it does not cover the record bearing the Bates number DHS-001-00585-002283.  Pl. Mem. at 40 n.50.  This contention is without merit because that record in fact is covered by DHS' initial *Vaughn* index.  *See* 1st Holzer Decl., Ex. A at 2.

**3.**  Plaintiff contends that DHS' initial *Vaughn* index is inaccurate because it "list[s] page DHS-001-00548-00592 as a page released in full, but that page contains Exemption 6

redactions."  Pl. Mem. at 40 n.50.  Plaintiff is correct that the above page was released with

"Exemption 6 redactions," 2d Holzer Decl. ¶ 10, but the rationale for those redactions, broadened

subsequently to be redactions under Exemptions 6 and 7(C), is set forth in ¶¶ 35-40 of the First

Holzer Declaration.

    4.  Plaintiff contends that DHS' initial *Vaughn* index is incomplete because it does not

address certain other enumerated records bearing Bates numbers beginning with the prefix

"DHS-001-00585-."  Pl. Mem. at 40 n.50.  These records were omitted through inadvertence

from DHS' initial *Vaughn* index.  2d Holzer Decl. ¶ 9.  The records have been incorporated into

DHS' supplemental index.  *Id.*  The supplemental index is submitted herewith as the Attachment

to the Second Holzer Declaration.

> ## B.  THE ICE DECLARATIONS AND *VAUGHN* INDEX COVER ALL RECORDS THAT REQUIRE COVERAGE.

    Plaintiff contends that ICE's initial declaration and its *Vaughn* index are "incomplete"

because ICE has "failed to provide any justification for [its] withholding of certain records."  Pl.

Mem. at 40.  Plaintiff ignores, however, what happened earlier in this case.

    Except for subsequent referrals from other agencies, ICE made its "final production of

material in this action" on April 23, 2018.  6th JSR (May 21, 2018), ECF No. 29, at 3.

"Expressing interest in securing its early dismissal from this action," ICE "offered to provide

plaintiff with a sample *Vaughn* index" during a conference call that took place on May 11, 2018.

*Id.* at 6.  Accepting ICE's offer, *see id.* at 7; 7th JSR (June 29, 2018), ECF No. 30, at 2, plaintiff

sent an Excel spreadsheet to ICE by email dated July 13, 2018, that "'identif[ied] the beginning

and end Bates numbers of the [74] documents we would like ICE to include in its *Vaughn*

index.'"  8th JSR (Aug. 2, 2018), ECF No. 31, at 1.

"ICE produced its *Vaughn* index to plaintiff by email dated September 20, 2018."  9th JSR (Oct. 9, 2018), ECF No. 32, at 3.  Plaintiff now states that it found "many" of the explanations in ICE's *Vaughn* index to be "inadequate."  Pl. Mem. at 7.  Plaintiff has never said that before, however, or responded in any other way to ICE's *Vaughn* index.

The *Vaughn* index upon which ICE relies here is Exhibit C to the Declaration of Toni Fuentes (Jan. 16, 2020) (1st Fuentes Decl.), ECF No. 46-7.  That index is the same as the index that ICE produced to plaintiff in 2018.  *See* 2d Fuentes Decl. ¶ 19.  Plaintiff has identified certain documents that are not addressed by ICE's index.  Pl. Mem. at 40 n.51. "These documents fall," however, "under the category of Reports of Investigation (ROIs), which follow the same pattern in terms of format and structure as ROIs addressed by ICE's index and which likewise follow the same pattern in terms of the types of information withheld and the exemptions relied upon to withhold it."  2d Fuentes Decl. ¶ 20.

"Sampling procedures have been held to be 'appropriately employed where, as here, the number of documents [at issue in a FOIA case] is excessive and it would not realistically be possible to review each and every one.'"  *Meeropol v. Meese*, 790 F.2d 942, 958 (D.C. Cir. 1986) (Bork, J.) (quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1490 (D.C. Cir. 1984)). The sample of ROIs addressed by ICE's *Vaughn* index is a sample chosen by plaintiff.  *See* 8th JSR at 1.  The validity of ICE's withholdings should therefore be adjudicated on the basis of the sample covered by ICE's index rather than on the basis of additional "repetitive and redundant explanations."  *See Calderon v. Dep't of Agric.*, 236 F. Supp. 3d 96, 109 (D.D.C. 2017).

## V.   ALL NON-EXEMPT MATERIAL THAT OUGHT TO HAVE BEEN RELEASED HAS BEEN RELEASED.

"FOIA 552(b) requires . . . disclosure . . . [of] any 'reasonably segregable' information" from a document responsive to a FOIA request "after redaction of the exempt information" and

any portions that are "'inextricably intertwined with exempt portions.'"  *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).  An agency seeking "to demonstrate that all reasonably segregable material has been released . . . must provide a 'detailed justification' for its non-segregability . . . [but] is not required to provide so much detail that the exempt material would be effectively disclosed."  *Id.* (quoting *Mead*, 566 F.2d at 261).  An agency thus "fulfill[s] [its] obligation to show with 'reasonable specificity' why a document cannot be further segregated" by providing "a comprehensive *Vaughn* index, describing each document withheld, as well as the exemption under which it was withheld" and an affidavit attesting that the agency "conducted a line-by-line review of each document withheld in full and determined that 'no documents contained releasable information which could be reasonably segregated from the nonreleasable portions.'"  *See id.* (quoting *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996)).

Plaintiff declares it to be "evident" from its "review of the documents DHS, CBP, and ICE [have] produced in this case" that certain documents withheld "in full or in significant part" contain "segregable information" that ought to be released.  Pl. Mem. at 35 & n.44.  The speculation in which plaintiff engages is unwarranted.  Each defendant has submitted a "comprehensive *Vaughn* index," *see Johnson*, 310 F.3d at 776, or, in the case of ICE, a comprehensive sample index.  *See* 1st Holzer Decl., Ex. A; 2d Holzer Decl., Att.; Decl. of Patrick A. Howard (Jan. 30, 2020) (1st Howard Decl.), ECF No. 46-4, Att.; 1st Fuentes Decl., Ex. C.  Each defendant has also submitted one or more declarations attesting that it has reviewed the documents line by line and released all reasonably segregable information.  1st Holzer Decl. ¶ 49; 1st Howard Decl. ¶40; 2d Howard Decl. ¶ 56; 1st Fuentes Decl. ¶¶ 48-49; 2d Fuentes Decl.

¶¶ 24-25; *see also* 2d Holzer Decl. ¶ 15 (stating that DHS has withheld the facts contained in the memorandum from the General Counsel to the Secretary dated July 2, 2012, because the opinions of the General Counsel expressed in the memorandum "are based upon and reflect those facts"). Each agency has therefore "fulfill[ed] [its] obligation to show with 'reasonable specificity' why [the documents it has released] cannot be further segregated." *See Johnson*, 310 F.3d at 776 (quoting *Armstrong*, 97 F.3d at 578-79). Nothing more ought therefore to be required of them.

## CONCLUSION

Defendants' motion for summary judgment should be granted and plaintiff's cross motion for summary judgment denied for the foregoing reasons.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

s/ *David M. Glass*
DAVID M. GLASS, DC Bar 544549
Senior Trial Counsel
Department of Justice, Civil Division
1100 L Street, N.W., Room 12020
Washington, D.C. 20530
Tel: (202) 514-4469/Fax: (202) 616-8460
E-mail: david.glass@usdoj.gov
Dated: June 12, 2020             Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I certify that I served the within memorandum, the exhibits to the memorandum, and the response to plaintiff's statement pursuant to LCvR 7(h)(1) on all counsel of record by filing them with the Court by means of its ECF system on June 12, 2020.

s/ <em>David M. Glass</em>