**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, | |
| Plaintiff, | **Oral Argument Requested** |
| v. | Civil Action No. 1:17-cv-00548-TSC |
| DEPARTMENT OF HOMELAND SECURITY, *et al*., | |
| Defendants. | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Matthew S. Hellman (484132)
JENNER & BLOCK LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001
T: (202) 639-6000
F: (202) 639-6066
mhellman@jenner.com

Ethan Wong (admission pending)
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
T:(212) 891-1600
F: (212) 090-0894
ewong@jenner.com

Caroline M. DeCell (1015491)
Stephanie C. Krent, *Pro Hac Vice*
KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA UNIVERSITY
475 Riverside Drive, Suite 302
New York, NY 10115
T: (646) 745-8500
carrie.decell@knightcolumbia.org
stephanie.krent@knightcolumbia.org

*Counsel for Plaintiff*

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................................. 1

**ARGUMENT** .................................................................................................................. 1

   I.     DHS's and CBP's Exemption 5 Withholdings Remain Unjustified............................. 1

         A.     DHS's Exemption 5 Withholdings ............................................... 2

         B.     CBP's Exemption 5 Withholdings............................................... 7

  II.    CBP's Exemption 6 and 7(C) Withholdings Are Improper............................................. 9

         A.     The Knight Institute Challenges CBP's Withholding of Only Four Categories of Information Withheld Under Exemptions 6 and 7(C). ......... 9

         B.     CBP Has Failed to Show a Privacy Interest in the Information the Knight Institute Seeks. ...................................................................... 10

         C.     The Public Interest in This Information Requires Disclosure. ................ 14

 III.   ICE And CBP's Exemption 7(E) Withholdings Are Improper. ................................... 16

         A.     ICE's Exemption 7(E) Withholdings........................................ 17

         B.     CBP's Exemption 7(E) Withholdings....................................... 19

 IV.   The Agencies Have Failed to Release All Segregable, Non-Exempt Information....... 24

  V.    DHS and ICE Still Fail to Justify Their Withholding of Information Not Identified in Their Initial *Vaughn* Indices. ................................................................. 25

         A.     DHS's Supplemental Declaration Fails To Address Several Records Released In This Case and To Justify Withholdings from Newly Included Records. ...................................................................... 25

         B.     ICE's Supplemental Declaration Does Not Justify the Deficiencies in its *Vaughn* Index. ...................................................................... 28

**CONCLUSION** ............................................................................................................. 30

# TABLE OF AUTHORITIES[*]

CASES

*American Civil Liberties Union v. United States Department of Justice*, 655 F. 3d 1 (D.C. Cir. 2011) ......................................................................10, 11, 12, 14, 16

*Alasaad v. Nielsen*, 419 F. Supp. 3d 142 (D. Mass. 2019), *appeal docketed*, No. 20-1077 (1st Cir. Jan. 28, 2020) .........................................................................15, 18

*American Immigration Counsel v. United States Department of Homeland Security*, 950 F. Supp. 2d 221 (D.D.C. 2013)...................................................17, 25

*American Oversight v. United States General Services Administration*, 311 F. Supp. 3d 327 (D.D.C. 2018) ..................................................................................4, 27

*Bristol-Myers Co. v. Federal Trade Commission*, 424 F.2d 935 (D.C. Cir. 1970) ...................4, 8

*Citizens for Responsibility & Ethics in Washington v. United States Department of Justice*, 746 F.3d 1082 (D.C. Cir. 2014)................................................14, 16, 23

*Davidson v. United States Department of State*, 206 F. Supp. 3d 178 (D.D.C. 2016), *aff'd*, 728 F. App'x 7 (D.C. Cir. 2018)................................................25, 29

*Department of Air Force v. Rose*, 425 U.S. 352 (1976) ...............................................15

*Ellis v. United States Department of Justice*, 110 F. Supp. 3d 99 (D.D.C. 2015), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016).....................6, 27

*Environmental Protection Agency v. Mink*, 410 U.S. 73 (1973) ....................................7

*Hall v. United States Department of Justice*, 552 F. Supp. 2d 23 (D.D.C. 2008) ...................11, 12

*Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155 (D.D.C. 2017) ..................................................................................................8

*Hunton & Williams LLP v. United States Environmental Protection Agency*, 248 F. Supp. 3d 220 (D.D.C. 2017) .................................................................................5

*Hornbeck Offshore Transportation, LLC v. United States Coast Guard*, No. Civ. A. 04-1724, 2006 WL 696053 (D.D.C. Mar. 20, 2006) .........................................6

*Judicial Watch, Inc. v. United States Department of Justice*, No. CV 17-0832, 2019 WL 4644029 (D.D.C. Sept. 24, 2019).....................................................3, 27

*Long v. Immigration & Customs Enforcement*, 279 F. Supp. 3d 226 (D.D.C. 2017)...................17

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Mead Data Central, Inc. v. United States Department of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ..................................................................................................24

*Montrose Chemical Corp. of California v. Train*, 491 F.2d 63 (D.C. Cir. 1974)........................7, 8

*National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004) .......................14, 15

*National Association  of Retired Federal Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) ..................................................................................................13

*National Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ..........................4

*PHE, Inc. v. Department of Justice*, 983 F.2d 248 (D.C. Cir. 1993) .......................................17, 18

*Playboy Enterprises, Inc. v. United States Department of Justice*, 516 F. Supp. 233 (D.D.C. 1981), *aff'd in part, modified in part*, 677 F.2d 931 (D.C. Cir. 1982) .........................................................................................................8

*SafeCard Services, Inc. v. Securities Exchange Commission*, 926 F.2d 1197 (D.C. Cir. 1991) ...................................................................................................3

*Schoenman v. Federal Bureau of Investigation*, 604 F. Supp. 2d 174 (D.D.C. 2009) ....................................................................................................25

*Stein v. United States Department of Justice*, 134 F. Supp. 3d 457 (D.D.C. 2015) ...............24, 29

*Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) ........................................................................8

*\*Whittaker v. United States Department of Justice*, No. 18-CV-01434, 2019 WL 2569915 (D.D.C. June 21, 2019) ...........................................16, 19, 20, 21, 22, 23

STATUTES

5 U.S.C. § 552(b)(5) ........................................................................................................................1

5 U.S.C. § 552(b)(6) ........................................................................................................................1

5 U.S.C. § 552(b)(7)(C) ...................................................................................................................1

Plaintiff, the Knight First Amendment Institute at Columbia University (the "Knight Institute" or "Institute"), respectfully submits this reply memorandum of law in further support of its cross-motion for summary judgment against Defendants the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE") (collectively, the "Agencies").

## PRELIMINARY STATEMENT

The Knight Institute brought this Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, lawsuit seeking the release of records related to the government's suspicionless searches of individuals' electronic devices at the nation's borders, as described in the Institute's March 2017 FOIA request (the "Request").  In support of its motion for summary judgment, the Institute explained that the Agencies had failed to justify their decisions to withhold information from responsive documents under FOIA Exemptions 5, 6, 7(C), and 7(E), *see* 5 U.S.C. § 552(b)(5)–(7).  Apparently conceding that their original justifications were inadequate, the Agencies now rely upon new, supplemental declarations.  In almost every instance, however, the new declarations are as inadequate as their predecessors.  As explained below, the Agencies continue to misstate the relevant law and to provide an insufficient basis to withhold documents of great public importance.  The Court should therefore grant summary judgment in the Knight Institute's favor.

## ARGUMENT

## I.      DHS'S AND CBP'S EXEMPTION 5 WITHHOLDINGS REMAIN UNJUSTIFIED.

The Knight Institute's opening brief in support of its motion for summary judgment explained that DHS and CBP had not justified their withholdings under Exemption 5, claiming

deliberative process, attorney-client, and work-product privileges. *See* Pl.'s Br. in Supp. of Cross-Mot. for Summ. J. ("Pl.'s MSJ Br.") at 11–20, ECF No. 50-1. The Agencies have now offered new, supplemental declarations in an attempt to shore up their justifications for these withholdings. With two minor exceptions, those declarations are inadequate, and the Agencies still have not met their burden of justifying the bulk of their Exemption 5 withholdings.[1]

## A.    DHS's Exemption 5 Withholdings

*First*, the Knight Institute challenged DHS's redaction of certain portions of an Office of Civil Rights and Civil Liberties ("CRCL") Impact Assessment of Border Searches of Electronic Devices. *See* Declaration of Matthew Hellman ("Hellman Decl."), ECF No. 50-5, Ex. M; *see also* Pl.'s MSJ Br. at 14–15 (explaining why Exemption 5 does not apply to this document). DHS relied on Exemption 5 in withholding information under the headings "Fourth Amendment, Border Search Authority," "Fourth Amendment, Electronic Devices at the Border," "First Amendment," and "Equal Protection and Religious/Ethnicity Discrimination."

---

[1] The Knight Institute no longer challenges ICE's Exemption 5 withholdings in two documents titled "Computer Border Search Discussion Topics." *See* 2017-ICLI-0011 62–64, 2017-ICLI-0011 67–82 (ICE *Vaughn* Index at 10–14, ECF No. 46-7) (withheld in full). The Institute accepts the justification provided in ICE's supplemental declaration with respect to these documents. In contrast to the other Agencies' invocation of the deliberative process, attorney-client, and work-product privileges, ICE justified its withholdings with a specific, detailed narrative of the background and purpose of the documents. *See* Defs.' Reply in Supp. of Mot. for Summ. J. and Opp. to Pl.'s Cross Mot. for Summ. J. ("Defs.' Reply Br.") at 11–13, ECF No. 57; Supplemental Declaration of Toni Fuentes ("Suppl. Fuentes Decl.") ¶ 5, ECF No. 57-3.

Similarly, the Institute no longer challenges DHS's Exemption 5 withholdings to a document, *see* Hellman Decl. Ex. I, described as "email communications between the DHS Office of the General Counsel and the CBP Office of Chief Counsel," Suppl. DHS *Vaughn* Index at 8–9, ECF No. 57-1. The Institute accepts the justifications provided in DHS's supplemental declaration, which include assurances that, "[a]t the time of the communication and since, [attorney-client] confidentiality has been maintained." *See* Supplemental Declaration of James Holzer ("Suppl. Holzer Decl.") ¶ 21, ECF No. 57-1.

DHS invokes the deliberative process privilege here, but that privilege is inapplicable because DHS has not identified any specific agency decision that the document's redacted portions informed. DHS's supplemental declaration says only that the "redacted portions reflect issues that authorities have determined to be, in their judgment, worthy of discussion or consideration by the Secretary in advance of a final agency decision," that the Impact Assessment's purpose was to "offer[] policy advice to . . . leadership about how to improve accountability, oversight, and notice about redress," and that the recommendations in the assessment were advisory in nature. Suppl. Holzer Decl. ¶ 17. That kind of conclusory, generic statement is insufficient to invoke the deliberative process privilege. *See Judicial Watch, Inc. v. DOJ*, No. CV 17-0832, 2019 WL 4644029, at *8 (D.D.C. Sept. 24, 2019) (requiring agencies to identify the "final policies or decisions[] connected with [the] entries").

As the Knight Institute explained in its opening brief, DHS must identify the final policies or decisions connected with this allegedly deliberative and pre-decisional text. Pl.'s MSJ Br. at 14. "In order to carry its burden, the agency must describe not only the contents of the document but also enough about its context . . . to establish that it is a pre-decisional part thereof. Specifically, the court needs to know whether the document explains, directly or by reference*, the reason for the agency's decision*." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1204 (D.C. Cir. 1991) (citations omitted) (emphasis added); *see also Judicial Watch*, 2019 WL 4644029, at *8 ("[The agency] must provide enough information about the processes, decisions, or policies at issue to aid the Court in determining whether these entries were part of a deliberative process that preceded an agency decision or policy."). DHS states that the withheld portions were considered "worthy of discussion or consideration by the Secretary in advance of a final agency decision." Suppl. Holzer Decl. ¶ 17. But it is impossible to tell from this statement

3

whether the withheld portions contributed to any *actual* agency decision, let alone what that agency decision was. And referring to the withheld information as "worthy of discussion or consideration" and "advice" does not show that it contained the *reason* for DHS's (unidentified) decision. The deliberative process privilege does not apply.[2]

*Second*, Plaintiff challenged DHS's Exemption 5 withholding of a draft document by an unidentified CRCL employee.[3] *See* Pl.'s MSJ Br. at 13–14. DHS now insists that this document was properly withheld under the deliberative process privilege because it "was a part of the Agency's *continuing process* of examining its policies guiding the border search of electronic devices, how searches occur, and related civil rights and civil liberties issues." Suppl. Holzer Decl. ¶ 11 (emphasis added). This is one of many instances where DHS attempts to "throw a protective blanket over all information" by declaring it part of a "continuing" deliberative process. *Cf. Bristol-Myers Co. v. FTC*, 424 F.2d 935, 939–40 (D.C. Cir. 1970). Although agencies may sometimes "generate memoranda containing recommendations which do not ripen into agency decisions" but which are nevertheless privileged, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975), DHS takes this possibility too far. Even if a final decision were never reached, DHS would still be required to "describe either the specific deliberative process,

---

[2] DHS's supplemental declaration also claims that the redacted information is subject to attorney-client privilege because it "reflect[s] confidential communications between attorneys within the Office of the General Counsel and the Secretary regarding the Department's legal authority as it relates to electronic device search policies and the implementation of those policies." Suppl. Holzer Decl. ¶ 18. This assertion of attorney-client privilege is deficient. The most glaring omission is the declaration's failure to "demonstrat[e] . . . confidentiality both at the time of the communication *and maintained since*." *Am. Oversight v. U.S. Gen. Servs. Admin.*, 311 F. Supp. 3d 327, 342 (D.D.C. 2018) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (emphasis added)). That omission is unsurprising, as it appears the Impact Assessment was intended to be shared broadly. Without specific assurances that the redacted portions were kept in confidence, DHS's assertion of attorney-client privilege fails.

[3] DHS-001-00585-000298 (Suppl. DHS *Vaughn* Index at 16–17) (withheld in full).

the function of the particular record, or the nature of the decisionmaking authority" at issue. *Hunton & Williams LLP v. U.S. EPA*, 248 F. Supp. 3d 220, 242–45 (D.D.C. 2017) (rejecting an assertion of deliberative process privilege where the *Vaughn* index "mention[ed] a meeting" but did "not describe the deliberative process of which that meeting was a part" and "omit[ted] the *role* of this particular document, the nature of the decisionmaking authority vested in the participants, or any potential harm to the deliberative process that would be incurred by releasing the document").

Here, DHS has not identified the final policy or decision in service of which this document was drafted.  Nor has it represented that this document was part of a deliberative process that never ripened into a  decision.  Rather, DHS says only that this document is part of a "continuing process of examining its policies."  Suppl. Holzer Decl. ¶ 11.  That kind of generic assertion, if credited, would transform the exemption into very "protective blanket" the law forbids because almost any document could be described as bearing on some sort of unspecified agency policy.  This Court should hold that DHS's Exemption 5 withholding of this document is improper.

*Third*, Plaintiff challenged the Exemption 5 withholding of a memorandum from the DHS General Counsel to the DHS Secretary.[4]  *See* Pl.'s MSJ Br. at 14.  DHS's initial declaration and *Vaughn* index provided no information about the content of this document, and its supplemental declaration still falls short.  Yet again, DHS attempts to justify its reliance on the deliberative process privilege with a vague assertion: the memorandum "was a part of the Agency's ongoing process of examining policies relative to the search of electronic devices at the border as well as associated litigation considerations," and it deals with "the potential impact

---

[4] DHS-001-00585-01847–73 (DHS *Vaughn* Index at 10, 24) (withheld in full).

of policy decisions on prior or anticipated litigation against the Agency arising from searches of electronic devices at the border." Suppl. Holzer Decl. ¶¶ 13, 15. While DHS mentions "litigation considerations," it does not specify the litigation at issue.[5] Moreover, it does not identify a policy decision that this memorandum informed (nor does it aver that the decision never came to fruition). Rather, DHS again asserts only an "ongoing process of examining policies" to justify its withholding. Suppl. Holzer Decl. ¶ 13. As explained above, this assertion fails to meet DHS's burden of showing that the deliberative process privilege—and thus Exemption 5—applies to this document.

Nor can DHS justify this withholding based on attorney-client or work-product privilege.[6] As with the CRCL Impact Assessment, DHS fails to assert that this memorandum was kept confidential. Without confidentiality, attorney-client and work-product privileges do not attach. Nor does DHS "state the subject matter, number of pages, author, date created, and identities of all persons to whom the original or any copies of the documents were shown or provided," as required to assert attorney-client privilege. *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, No. Civ. A. 04-1724, 2006 WL 696053, at *14 (D.D.C. Mar. 20, 2006) (quotation marks omitted). Finally, DHS has not supported its work-product privilege claim with an adequate "description of the nature of and contents of the withheld document" and an "indication of the type of litigation" anticipated. *Ellis v. U.S. DOJ*, 110 F. Supp. 3d 99, 108

---

[5] In contrast to this bareboned assertion, ICE fully described a memorandum it withheld under Exemption 5 as "prepared in [the] aftermath of the conclusion of proceedings in *United States v. Kim*" and gave specific, detailed information about the final decision in advance of which the memorandum was prepared. Suppl. Fuentes Decl. ¶¶ 5–6.

[6] DHS's supplemental declaration claims that the Knight Institute did not challenge its assertions of attorney-client and work-product privilege as to this document. Suppl. Holzer Decl. ¶ 15. But the Institute's opening brief makes clear that it challenged all Exemption 5 withholdings in each document at issue, even if it did not specifically discuss each claim of privilege with respect to each document. Pl.'s MSJ Br. at 11–12. The Institute's arguments regarding work-product and attorney-client privilege apply with equal force to this document. *See id.* at 16–19.

(D.D.C. 2015), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016).  DHS's paltry explanations of this document's nature and contents are certainly insufficient, and it has failed entirely to provide an indication of the type of litigation in anticipation of which this document was prepared.  Its invocations of attorney-client and work-product privilege therefore fail as well.

### B.    CBP's Exemption 5 Withholdings

CBP continues to rely on the deliberative process privilege in withholding 271 pages of factual material in spreadsheet form.[7]  CBP asserts that the spreadsheets "reflect the ongoing exchange of information between CBP and CRCL to allow CRCL to gain information about CBP's policies, with the anticipation of further policy recommendations to agency leadership." Supplemental Declaration of Patrick A. Howard ("Suppl. Howard Decl.") ¶ 12, ECF No. 57-2. But that open-ended description—no more than a claim that the spreadsheets contain information that might someday be used to make policy recommendations—could cover almost any agency document.  And in seeking to justify its application of the deliberative process to the purely factual information contained in these spreadsheets, CBP misapprehends the purpose and scope of the privilege.

The deliberative process privilege is meant to encourage the "free exchange of *ideas*," and so factual material is privileged only when "inextricably intertwined with policy-making processes."  *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 67 (D.C. Cir. 1974) (quoting *Soucie v. David*, 448 F.2d 1067, 1077–78 (D.C. Cir. 1971)) (emphasis added); *see also EPA v. Mink*, 410 U.S. 73, 87–88 (1973).  Thus, although the deliberative process privilege allows withholding of purely factual material in some circumstances, it does not attach every time an

---

[7] CBP *Vaughn* Index at 27–30, ECF No. 46-4 (describing withheld record).

agency collects or communicates factual information that might be used by someone, at some point, to make a decision. Rather, there is only a "*limited* exception to the general principle that purely factual material may not be withheld under Exemption 5." *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 167–68 (D.D.C. 2017) (quoting *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13, 37 (D.D.C. 2012) (emphasis added)); *see Bristol-Myers*, 424 F.2d at 939 ("Purely factual reports . . . cannot be cloaked in secrecy by an exemption designed to protect only 'those internal working papers in which opinions are expressed and policies formulated and recommended.'" (citation omitted)).

While CBP describes the spreadsheets at issue as "records . . . created for the specific purpose of evaluating whether changes to policies might be necessary and to make recommendations to agency leadership regarding potential changes to those policies," Suppl. Howard Decl. ¶ 12, it does not assert that the facts contained in these spreadsheets are "inextricably intertwined" from the policy-making process. Nor could it. Even if these facts *informed* the policy-making process, they do not, standing alone, reveal "the mental processes of decision-makers." *Montrose Chem. Corp.*, 491 F.2d at 70 (holding that summaries of record evidence were exempt from disclosure because they reflected the mental processes of decisionmaking); *see also Vaughn v. Rosen*, 523 F.2d 1136, 1145 (D.C. Cir. 1975); *Playboy Enters., Inc. v. DOJ*, 516 F. Supp. 233, 242 (D.D.C. 1981), *aff'd in part, modified in part*, 677 F.2d 931 (D.C. Cir. 1982). The Court should not allow CBP to read this exception "so broadly as to swallow the rule." *Hardy*, 243 F. Supp. 3d at 167 (quoting *Nat'l Whistleblower Ctr.*, 849 F. Supp. 2d at 37).

## II.      CBP'S EXEMPTION 6 AND 7(C) WITHHOLDINGS ARE IMPROPER.

CBP fails to justify its wide-ranging redactions under FOIA Exemptions 6 and 7(C).[8]

First, it mischaracterizes the information that the Knight Institute argued could not be withheld

from search reports, spreadsheets, and audits.   Second, it overstates the likelihood that the

revelation of this information will lead to an invasion of personal privacy.   Finally, it applies an

incorrect, overly burdensome legal standard in diminishing the public interest in disclosure of the

information.   Because there is no justification for CBP's withholding of travelers' countries of

birth, ethnicities, citizenship, and occupations, the Institute is entitled to summary judgment with

respect to the withholding of that information under Exemptions 6 and 7(C).

### A.      The Knight Institute Challenges CBP's Withholding of Only Four Categories of Information Withheld Under Exemptions 6 and 7(C).

As initial matter, CBP's briefing confuses the issues before the Court.   In arguing that it

is entitled to withhold information to protect privacy interests, CBP lists *all* of the information

that might appear in a search report (called an Electronic Media Report, or "EMR")—listed

below—as if the Knight Institute were asking for all those categories to be disclosed.[9]   CBP

---

[8] The Knight Institute continues to challenge CBP's withholdings from the records identified in its opening brief, *see* Pl.'s MSJ Br. at 21 nn.30–31, 33, with the exception of the following records: CBP000235–92, CBP000348–429, CBP000660–1416, CBP005209–16, CBP005231–57, and CBP's Mar. 22, 2019 release (pp. 5, 13–17) (CBP *Vaughn* Index 8–11, 23–30).

[9] In its opening brief, the Knight Institute explained that it was challenging the withholding of country of birth, ethnicity, citizenship, and occupational information from EMRs, similar incident-level search reports, and related spreadsheets.   The government has argued that "CBP has not relied on Exemption 7(C) to withhold information of that type from 'aggregate or statistical information unconnected with a specific law enforcement inspection on a particular day.'"   Defs.' Reply Br. at 14 (quoting Suppl. Howard Decl. ¶ 23).   Yet CBP withheld that type of information not only from search reports, but also from the challenged spreadsheets.   *See* CBP005119–44 (withholding "immigration status" under Exemptions 6 and 7(C)), CBP005166–70 (withholding "Citizenship Country Name" under Exemptions 6 and 7(C)), Hellman Decl. Ex. B (spreadsheet summarizing searches but withholding "Country of Birth" and "Coutnry of

released the *italicized* categories of information from the outset, and the Institute is challenging

the withholding of only the four **bolded** categories of information below.[10]

- *the date and time of the search to which the EMR pertains*;
- the traveler's name;
- the traveler's date of birth;
- the traveler's passport number;
- **the traveler's ethnicity;**
- *the traveler's race*;
- *the traveler's gender*;
- **the traveler's country of birth;**
- **the traveler's citizenship;**
- **the traveler's occupation;**
- the purpose of the traveler's trip;
- the traveler's plans upon entry to the United States;
- the duration of the traveler's trip;
- details regarding the traveler's foreign travel;
- whether the individual had a travel companion;
- whether the traveler was cooperative;
- specific descriptions of the electronic devices carried by the traveler.

Defs.' Reply Br. at 14–15 (emphasis added).  In short, the Institute's argument is far narrower

than the government suggests, and as discussed below, there is no risk that the disclosure of these

three additional categories of information will invade a traveler's privacy.  Even if there were a

small risk that a traveler could be identified on the basis of this information, the public interest in

disclosure far outweighs the risk.

>    **B.**    **CBP Has Failed to Show a Privacy Interest in the Information the Knight
>           Institute Seeks.**

With the Knight Institute's argument properly framed, the weakness of CBP's privacy

arguments become clear.  Travelers have no more than a *de minimis* privacy interest in their

country of birth, citizenship, and/or occupation, because that information, even attached to their

---

Citizenship"); Hellman Decl., Ex. H (withholding 271 pages in full) (*see* CBP *Vaughn* Index 23–
25, 27–28 (noting that "information regarding ethnicity" was withheld)).

[10] The Knight Institute is no longer challenging CBP's withholding of information about the
purpose and duration of a traveler's trip.

race, gender, and travel dates, is extremely unlikely to be personally identifying. *See ACLU v. DOJ*, 655 F.3d 1, 12 & n.17 (D.C. Cir. 2011) (recognizing that for either Exemption 6 or 7(C) to apply, the disclosure must "compromise a substantial, as opposed to *de minimis*, privacy interest" (quoting *Multi Ag Media, LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008))). Travelers' privacy interests are further shielded by the quantity of searches CBP conducts. CBP stresses that it searches electronic devices with "relative infrequency," but the word "relative" is key. Suppl. Howard Decl. ¶ 19. CBP processed "approximately 397 million arriving international travelers" in 2017. *Id.* Searching the electronic devices of only .007 percent of those travelers, *id.*, results in more than 7,000 searches per day. A traveler has only a *de minimis* privacy interest in general categories of information about themselves, such as citizenship and occupation, that are diluted in a large pool of other profiles.

CBP has no argument to the contrary. It points to no cases holding that the disclosure of such limited information implicates a "substantial" privacy interest. Nor can it. Courts have warned against the overredaction of information that would reveal only "bits" of information about an individual, and not "the 'whole.'" *ACLU*, 655 F.3d at 10. CBP's assertion that the disclosure of limited information might enable identification by the traveler's closest associates is similarly unsupported by case law. In *Hall v. Department of Justice*, for example, the government withheld significant amounts of information from reports of investigation, arguing that all of that information "could be used to identify . . . witnesses" because "the redacted information relate[d] 'to a small group of employees who know each other and as such are easily

identifiable to each other.'"  552 F. Supp. 2d 23, 30 (D.D.C. 2008).  The Court rejected this "vague and conclusory" argument and denied the government summary judgment.  *Id.*[11]

CBP's series of hypothetical examples likewise show that the "bits" of information the Knight Institute seeks here implicate at most a *de minimus* privacy interest.  In each example, CBP tacitly acknowledges that most people would have no way of identifying a particular traveler, and its speculations that a handful of people might be able to do so are highly implausible.

CBP first posits that a search record discussing "an accountant whose country of origin is Italy whose device was searched on a particular date after a two-week trip to Japan" would reveal the traveler's identity to "friends, neighbors, and students."  Defs.' Reply Br. at 17 (quoting Suppl. Howard Decl. ¶¶ 19–20).  First, the Knight Institute is no longer seeking disclosure of the duration of a traveler's trip. Second, CBP provides no evidence to suggest that the number of Italian accountants traveling from Japan on any given day is so few that it would allow identification of a particular individual.

So too with CBP's second example.  The "female-professor [sic] from Spain with two children who teaches anthropology" would not be identifiable to her student from the information sought here.  *Id.* (quoting Suppl. Howard Decl. ¶ 26).  First, the Agency can redact information about travel companions, eliminating the possibly identifying feature of having two children.  Second, it need not reveal the specific university at which this hypothetical professor teaches.  Disclosure of a traveler's occupation (lawyer) is not the same as disclosing the traveler's *employer* (Jenner & Block LLP).  Nor for that matter would an EMR be likely to

---

[11] *Hall* dealt with Exemption 6, rather than Exemption 7(C). As discussed above, for either exemption to apply, more than *de minimis* privacy interests must be implicated by the disclosure. *ACLU*, 655 F.3d at 12 & n.17.

reveal the subject the professor teaches, as opposed the general "occupation," *i.e.*, professor. That leaves the government to assert that a person is identifiable by dint of being a female professor from Spain who traveled on a certain day—but the government provides no evidence supporting the facially implausible proposition that a "student" would know their professor's specific travel dates and would be able to identify her based on that generic information.

Finally, CBP posits that a neighbor who has been told by a traveler that the traveler was searched could review a public database of EMRs "to see if she could find one that *seemed* to meet the description of her neighbor." *Id.* (emphasis added) (quoting Suppl. Howard Decl. ¶ 26). This neighbor might "draw conclusions—warranted or unwarranted—about her neighbor or view him in a different light." *Id.* This strained hypothetical reveals the larger deficiencies in CBP's argument that the EMR information requested by the Knight Institute implicates any traveler's privacy interest. First, as the Agency itself emphasizes, "[t]he EMRs that CBP has produced in this case are 'a 2% sample of the incident-level reports dealing with border searches of electronic devices created during the . . . 18 months [preceding January 16, 2018].'" *Id.* at 20 (quoting 5th Joint Stat. Report at 4, ECF No. 26). Thus, it is simply not plausible that a hypothetical neighbor, even armed with the knowledge of a search on a certain date at a certain port of entry, would be able to find the record of that traveler's search. Second, "[d]isclosure does not, literally by itself, constitute a harm; it is the requester's (or another's) reaction to the disclosure that can sting." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989). But the only "sting" that CBP can conjure in the neighbor hypothetical is that a neighbor *might* draw *unwarranted* conclusions about the traveler and view the traveler in "a different light." Defs.' Reply Br. at 17 (quoting Suppl. Howard Decl. ¶ 26). The Agency cannot refuse to fulfill its

FOIA obligations merely by speculating that someone might erroneously interpret disclosed information.

### C.   The Public Interest in This Information Requires Disclosure.

Finally, even if the Court finds that a tiny group of individuals might be able to identify travelers based on the additional information sought in the EMRs, the public interest favors disclosure.  As CBP acknowledges, the Knight Institute has identified a press release and three news stories in respected outlets that allege suspicionless searches of electronic devices at the border targeted Muslims and journalists.  *See* Pl.'s MSJ Br. at 23–24.

First, CBP's argument that the Institute has not conclusively proven a violation of the law, Defs.' Reply Br. at 19–20, is neither here nor there.   "'Matters of substantive law enforcement policy are properly the subject of public concern,' whether or not the policy in question is lawful."  *Citizens for Resp. & Ethics in Wash. v. U.S. DOJ* ("*CREW*"), 746 F.3d 1082, 1095 (D.C. Cir. 2014) (*quoting ACLU*, 655 F.3d at 14).  The Request sought information about substantive law enforcement policy, which implicates the public interest.  Records that reveal information about an "agency's own conduct" implicate the public interest; citizens have a "right to be informed about what their government is up to."  *ACLU*, 655 F.3d at 12 (quotation marks omitted).

Even if CBP's heightened standard were appropriate, the public interest would still favor disclosure.  When "the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004).  Here, the Institute has presented a press release detailing ten complaints to CBP by Muslims detailing improper searches and multiple news

14

stories in reputable publications. *See* Pl.'s MSJ Br. at 2–4; *see also Alasaad v. Nielsen*, 419 F.
Supp. 3d 142, 169–70 (D. Mass. 2019). These reports meet the Knight Institute's burden of
providing "evidence that would warrant a belief by a reasonable person that the alleged
Government impropriety might have occurred." *Favish*, 541 U.S. at 174. This case is not
*Favish*, in which the plaintiff's allegations had been refuted by five separate government
investigations. *Id.* at 161.

CBP's arguments to the contrary fail. First, it asks this Court to apply an outdated legal
standard. The "compelling evidence" standard on which CBP relies was articulated by the D.C.
Circuit before the Supreme Court published *Favish*. Defs.' Reply Br. at 18 (quoting *Schrecker v.
U.S. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003)). The *Favish* standard requiring "evidence that
would warrant a belief by a reasonable person" would apply. 541 U.S. at 174.

Next, CBP puts the cart before the horse. It argues that the news stories and complaints
would be inadmissible in court and insufficient prove a discrimination case. Defs.' Reply Br. at
19–20. Maybe so—but this is a FOIA case, not a discrimination case seeking to prove liability
on the merits. No court has suggested that a plaintiff must present admissible evidence sufficient
to prove a discrimination case in order to show that disclosure would be in the public interest.
And CBP's standard turns FOIA on its head. The purpose of FOIA is "to pierce the veil of
administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air
Force v. Rose*, 425 U.S. 352, 361 (1976) (quotation marks omitted). FOIA allows the public
access to government records that might reveal misconduct; conclusive proof of misconduct
cannot be a threshold requirement.

Finally, CBP argues that disclosure is not likely to advance the public interest because the
two-percent sample of EMRs does not "necessarily include[] searches of electronic devices

transported by journalists, Muslims, activists, or attorneys." Defs.' Reply Br. at 20. "But the fact that the data will not be perfect does not mean that there is no public interest in their disclosure." *ACLU*, 655 F.3d at 14. And it is telling that CBP—which actually has access to this information—does not aver that the data *do not* contain information of such searches. In any event, such a result *would* advance the public interest in learning about CBP's propensity to conduct targeted searches of electronic devices.

CBP cannot justify withholding the limited categories of information that the Knight Institute seeks from the EMRs. That information does not implicate privacy interests, and the public interest favors disclosure. The Institute's motion for summary judgment should be granted.

## III.   ICE AND CBP'S EXEMPTION 7(E) WITHHOLDINGS ARE IMPROPER.

ICE and CBP withheld information from thousands of pages of documents, including policies and handbooks, internal communications, search reports, traveler complaints, and spreadsheets.[12] ICE and CBP have failed to show that much of this withheld information actually reveals a procedure, technique or guideline, or that disclosure of this information would risk a reasonably expected circumvention of law.

To justify its application of Exemption 7(E), an agency first "must at least provide *some* explanation of what [techniques,] procedures, [or guidelines] are involved and how they would be disclosed." *CREW*, 746 F.3d at 1102. "The phrase 'techniques and procedures' . . . refers to how law enforcement officials *go about* investigating a crime." *Whittaker v. U.S. DOJ* No. 18-CV-01434, 2019 WL 2569915, at *2 (D.D.C. June 21, 2019) (determining negative information

---

[12]   The Knight Institute continues to challenge withholdings from the records it identified in its opening brief, *see* Pl.'s MSJ Br. at 25 n.37. However, the Institute no longer challenges the 7(E) withholdings from traveler complaints, *see id.* at 37 n.46 (identifying complaints), or from the pilot program PowerPoint presentation, CBP000212–34 (CBP *Vaughn* Index 11–13), except insofar as CBP failed to release all reasonably segregable information. *See infra* Part IV.

about an individual in a background check—standing on its own—is not a technique or procedure).  Next, an agency must "provide a 'relatively detailed justification' for each record that permits the reviewing court . . . to understand how disclosure would create a reasonably expected risk of circumvention of the law."  *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 246 (D.D.C. 2013).  These justifications must be reasonable.  *Long v. Immig. & Customs Enf't*, 279 F. Supp. 3d 226, 234 (D.D.C. 2017) (rejecting an agency's invocation of Exemption 7(E) because an explanation is not a "rubber stamp" to withholding, it also must be "reasonable").

ICE and CBP have failed on both fronts.  Notwithstanding their new, supplemental declarations, they have offered only conclusory justifications for how the information they withheld would reveal procedures, techniques, or guidelines.  And they have still failed to explain how the risk of circumvention is "reasonably expected."  *Am. Immigr. Council*, 950 F. Supp. 2d at 246.  Therefore, ICE and CBP have not met their burden in withholding information under Exemption 7(E).

### A.    ICE's Exemption 7(E) Withholdings

ICE has failed to defend its decision to withhold legal analysis from its policies and handbooks under Exemption 7(E), because that kind of information does not reveal techniques, procedures, or guidelines.[13]  "[M]aterials that define standards for determining whether the law has been violated" are "precisely the type of information appropriate for release."  *PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 251–52  (D.C. Cir. 1993) ("[The government] does not explain why the agency could not release . . . the discussion of search and seizure law and the digest of useful caselaw. Material like this is precisely the type of information appropriate for

---

[13] The relevant policies or handbooks are cited in the Institute's opening brief.  *See* Pl.'s MSJ Br. at 32 & n.42.

release[.]").   ICE argues that the material withheld from Homeland Security Investigations ("HSI") internal handbooks is not legal analysis, but was "prepared to assist HSI agents in developing techniques to investigate criminal activities and to provide guidelines that the agents could refer to."  Defs.' Reply Br. at 28 (quoting Suppl. Fuentes Decl. ¶ 13).  But it is hard to imagine how that material could be anything but legal analysis.

Take, for example, the "Search and Seizure Handbook."  Suppl. Decl. of Matthew Hellman in Further Supp. of Pl.'s Cross-Mot. for Summ. J. ("2d Hellman Decl."), Ex. GG.  ICE withheld material from sections titled "Administrative Searches," "Functional Equivalent of the Border," and "Extended Border," stating that this material addresses "when the agents are permitted to conduct searches without warrants," as well as "the types of allowable administrative searches," what qualifies as "the equivalent of [the] border," and when agents may conduct searches "away from the actual border."  Suppl. Fuentes Decl. ¶ 15; *see also* Defs.' Reply Br. at 29.  Agents' authority to conduct warrantless searches at (or away from) the border is a function of law.  *See Alasaad*, 419 F. Supp. 3d at 154–56.  Thus, each of these sections—as described by ICE—sets forth the legal parameters of the government's search authority, which is "precisely the type of information appropriate for release."  *PHE, Inc.*, 983 F.2d at 251–52.

ICE's descriptions of other material withheld from internal handbooks suffer from similar flaws.  *See* Defs.' Reply Br. at 28–31.  A withheld section of the HSI "Computer Forensics Handbook" addresses "when a search is warranted with or without consent."  Suppl. Fuentes Decl. ¶ 14.  Withheld sections of the HSI Child Exploitation Handbook, *see* Hellman Decl. Ex. F, including sections titled "Search Warrant," "Title III Court Order," and "Jurisdictional Responsibility," contain information relating to "when a search warrant is required" and "when to request a warrant for a Title III Court Order."  Suppl. Fuentes Decl. ¶ 16.  And material

withheld from the HSI "National Security Investigation Handbook" section titled "FISA Application in Lone Wolf Situations, " *see* Hellman Decl. Ex. G, specifies procedures agents are "required to follow" when conducting certain types of searches. Suppl. Fuentes Decl. ¶ 17. Because the law itself dictates the answers to each of these questions, those answers cannot qualify as techniques, procedures, or guidelines for purposes of Exemption 7(E).

### B.      CBP's Exemption 7(E) Withholdings

CBP has failed to justify its categorical withholding of four types of information from EMRs, spreadsheets, and other communications: (1) the reason for the search, (2) whether a traveler was notified of a search and whether, why, or why not a tear sheet was provided, (3) certain demographic information, and (4) internal analysis contained in memoranda and communications. CBP contends that disclosure of this information would reveal the nature of the government's interest in different travelers, *see* Defs.' Br. at 23, 26–27, but it still has not articulated how release of this information would reveal any particular law enforcement techniques, procedures, or guidelines, or how it would create a reasonably expected risk of circumvention of the law.

*Whittaker v. United States Department of Justice* is instructive. No. 18-cv-01434, 2019 WL 2569915 (D.D.C. June 21, 2019). There, the court rejected the FBI's attempt to withhold the results of a name check under Exemption 7(E) in response to a retired government employee's request for a complete record of his background investigation report. The FBI argued that the results would "reveal the type of information that the FBI reviews when conducting a name check, including what is determined to be relevant to a name check request and what type of information the FBI elevates to agencies requesting a name check." *Id.* at *1. The FBI further argued that the requested information could reveal "whether or not the FBI possesses

19

investigation information about a person," which could enable "hostile criminal/foreign elements" to "determine whether or not criminal or national security-related investigation exists based on the redactions asserted or lack thereof." *Id.* at *2. The court rejected these arguments for failing to make clear "what *procedures* are involved and how they would be disclosed." *Id.* (emphasis added) (quoting *CREW*, 746 F.3d at 1102); *see id.* at *3 (explaining that the FBI had failed to address whether the name check "results reference the technique or procedure themselves," whether they "implicitly reveal the technique or procedure used to gather information," or "whether they "reveal the criteria or standards the FBI uses to place information in the National Agency Check database."). Like the FBI, CBP has failed to explain how the data field entries at issue here would reveal a procedure, technique, or guideline.

*First*, CBP categorically withheld data from the "Reason for Search" field in its EMRs and spreadsheets tallying search statistics.[14] It asserted that disclosure of this information would reveal "CBP priorities and how CBP conducts risk assessments in using its finite resources," Suppl. Howard Decl. ¶ 33, and "could lead those who seek to circumvent the law to adjust their behavior with the goal of decreasing the likelihood" of a device search at the border, *id.* ¶ 34; *see also* Defs.' Reply Br. at 23. But CBP's reasoning does not hold up.

As a threshold issue, the Knight Institute has not demanded disclosure of the "narrative sections of all of the EMRs that CBP has produced in this case," Defs.' Reply Br. at 23; rather, the Institute seeks only disclosure of the relevant field data presented above the narrative sections of the EMRs. And CBP has produced only a random two-percent sample of EMRs created in an 18-month period. Thus, even in connection with the heavily redacted narrative sections,

---

[14] *See* Pl.'s MSJ Br. at 21 nn.30–31 (identifying EMRs and similar search reports). From other spreadsheets, CBP also redacted the reason for a traveler's search. *See* CBP000057–146, CBP000155–65, CBP000178–88, CBP000660–1416, CBP005119–44, CBP005209–16, CBP005231–57 (CBP *Vaughn* Index at 8).

disclosure of the "Reason for Search" entries in the sample EMRs would provide at best an incomplete and unreliable "basis for comparison of the handling of different inspections." *Id*. It is therefore unreasonable to expect that disclosure of this information would risk circumvention of the law.

While one spreadsheet CBP produced*, see* Hellman Decl. Ex. B, contains the stated reasons for all searches conducted over a six-year period, CBP has not explained how disclosure of this information would reveal any procedures, techniques, or guidelines or enable circumvention of the law. CBP argues that disclosure of "Reason for Search" information, along with the specific dates and times of the searches, could enable a traveler to determine "the nature of law enforcement interest in that traveler, which could reveal information about on-going investigations and [types of] inquires" and could "lead the traveler to take evasive actions to avoid future search." Suppl. Howard Decl. ¶ 34. As in *Whittaker*, however, CBP has failed to explain how—even assuming that disclosure of years-old "Reason for Search" information could reveal the existence of an *ongoing* investigation—it would also reveal any specific agency procedures, techniques, or guidelines. *See* 2019 WL 2569915, at *3.

Moreover, CBP's categorical redaction of *all* "Reason for Search" entries is untenable. It has not disavowed the authority to conduct device searches on a purely random basis. *See* Defs.' Br. at 22–24. As the Knight Institute explained in its opening brief, disclosure of the number of random searches conducted does not create a logical risk—let alone a reasonably expected risk—of circumvention of the law. *See* Pl.'s MSJ Br. at 31–32. Thus, CBP has provided unreasonable justifications for categorically withholding the "Reason for Search" entries from EMRs and spreadsheets under Exemption 7(E).

*Second*, CBP's justifications for withholding data field entries documenting whether a traveler was notified of a search, whether a tear sheet was provided, and if not, why not, also fail to describe how disclosure of such entries would reveal procedures, techniques, or guidelines or risk circumvention of the law.[15]  CBP contends that first, other information contained in an EMR could enable a traveler to determine that a particular EMR relates to her inspection; then, disclosure of the fact that the traveler was not informed of the search or provided a tear sheet would "permit that individual to infer from the applicable standard operating procedure 'that . . . CBP determined it would impair national security, law enforcement, officer safety, or other operational interests.'"  Defs.' Reply Br. at 26 (quoting Suppl. Howard Decl. ¶ 38).  Regardless of how plausible these speculations are, they do not demonstrate how disclosure of the notification and tear sheet information would reveal a procedure, technique, or guideline.  Again, as in *Whittaker*, CBP fails to explain whether these data field entries "reference the technique or procedure themselves" or "implicitly reveal the technique or procedure used to gather information."  2019 WL 2569915, at *3.  Furthermore, as explained in the Knight Institute's opening brief, CBP has established no reasonable expectation that disclosure of this information would enable circumvention of a future search.  *See* Pl.'s MSJ Br. at 30.

*Third*, CBP fails to demonstrate how disclosure of certain demographic information, compiled into aggregate search statistics, would reveal information about a technique, procedure or guideline.[16]  CBP argues that revealing aggregate information about travelers' nationalities,

---

[15] *See* Pl.'s MSJ Br. at 21 nn. 30–31 (identifying  EMRs and incident-level reports). From other spreadsheets, CBP also redacted information about traveler notification and the provision of tear sheets. *See* CBP000057–146, CBP000155–65, CBP000177–84, CBP000348–429, CBP005119–44, CBP005209–16 (CBP *Vaughn* Index at 8).

[16] *See* 2d Hellman Decl. Ex. II; Hellman Decl. Ex. B, CBP's Mar. 15, 2019 release (271 pages withheld in full), *id.* Ex. EE, CBP000166–177,  CBP000189–96, CBP00200, CBP000235–92, CBP000660–1416 (CBP *Vaughn* Index 8–11, 23–27, 27–30).

for example, could "provide insight into non-public sources of information and methodologies used by CBP in performing its law enforcement and border security duties."  Suppl. Howard Decl. ¶ 41; *see also* Defs.' Reply Br. at 27. But this description does not provide *any*—let alone *some*—explanation of "what procedures are involved and how they would be disclosed."  *CREW*, 746 F.3d at 1102.  CBP further contends that such statistics could reveal the existence of an ongoing operation.  Defs.' Reply Br. at 31.  Even taking such bald speculation at face value, however, it still does not explain how disclosure of aggregate nationality information could reveal "procedures" or "techniques."  *See Whittaker*, 2019 WL 2569915, at *2 (quotation marks omitted).  And CBP offers no further justification for the withholding of data regarding the sex of the travelers selected for device searches in connection with their nationalities, *see* Pl.'s MSJ Br. at 31.[17]

*Fourth*, and finally,  CBP barely responds to the Knight Institute's argument that it has improperly withheld information from internal memoranda relating to the CRCL Impact Assessment.  *See* Pl.'s MSJ Br. at 33–34 & 33 n.43 (identifying three challenged records).  CBP argues that the withheld information from one of those records contains "aggregate statistics from spreadsheets and reports regarding border searches."  Defs.' Reply Br. at 27 (quoting Suppl. Howard Decl. ¶ 14).  But the released sections of that record, titled "CBP Internal Affairs Report: Border Search of Electronic Devices and Documetns," belie that argument.  *See* Hellman Decl. Ex. FF.  The withheld information falls under a column labeled "Finding" and seems to discuss CBP policies.  For example, one partially redacted "finding" begins: "There is confusion concerning CBP's policy regarding the need to obtain supervisory approval prior [to] electronic

---

[17]  Apparently conceding that its withholding of aggregate data regarding the sex of those travelers, standing alone, was improper, CBP released that information to the Knight Institute on June 4, 2020.  *See* 2d Hellman Decl. Exs. HH, II.

device searches." *Id*.  Even assuming that the findings do contain aggregate statistics, CBP has not shown that the information is entitled to be withheld for the reasons stated above.  And CBP has not even attempted to argue that its withholdings from the other two records were justified.[18]

\*   \*   \*

In sum, ICE and CBP have failed to show that release of the information described above would reveal procedures, techniques and guidelines and would lead to a reasonably expected risk of circumvention of the law.  Their supplemental declarations contain largely conclusory or speculative explanations, and their briefing cites scant case law supporting their categorical withholding of the information at issue.  "[T]he burden is on the agency to show that nondisclosed, requested material falls within a stated exemption."  *Stein v. DOJ*, 134 F. Supp. 3d 457, 468 (D.D.C. 2015) (Chutkan, J.).  ICE and CBP have failed to meet their burden to justify their withholdings under Exemption 7(E).

## IV.   THE AGENCIES HAVE FAILED TO RELEASE ALL SEGREGABLE, NON-EXEMPT INFORMATION.

The Knight Institute reiterates its challenge to the Agencies' failures to disclose reasonably segregable portions of the records at issue.  *See* Pl.'s MSJ Br. at 34–39.  As the D.C. Circuit has recognized, "agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).  Yet even on reply, the Agencies' segregbility justification is rote: each agency argues that it has released all reasonably segregable information because it has submitted a declaration saying so.  *See*

---

[18] One of the records, titled "Electronic Device Inspection: A Follow-Up Study to CRCL," contain some aggregate data based on a follow-up study CBP commissioned. *See* Hellman Decl., Ex. EE. The previous section discusses why the withholding of aggregate data from that record was unjustified. The record contains additional withheld information, which CBP has not attempted to address.

Defs.' Reply Br. at 34–35.   The Agencies failed to address even the records the Institute highlighted as particularly egregious examples of the Agencies' overredactions.   *Compare id. with* Pl.'s MSJ Br. at 36–38 (identifying Hellman Decl. Exs. I, N, J, O, K, and L).   The Agencies have thus failed entirely to "fully explain [their] decisions on segregability" or to "provide descriptions of excerpts deemed to be non-segregable, with explanations as to those decisions." *Am. Immigr. Council*, 950 F. Supp. 2d at 248.   At the least, then, the Agencies must provide more complete *Vaughn* indices.   *See Schoenman v. FBI*, 604 F. Supp. 2d 174, 198 (D.D.C. 2009).

## V.   DHS AND ICE STILL FAIL TO JUSTIFY THEIR WITHHOLDING OF INFORMATION NOT IDENTIFIED IN THEIR INITIAL *VAUGHN* INDICES.

In its opening brief, the Knight Institute notified the Agencies that their *Vaughn* indices were incomplete.   Pl.'s MSJ Br. at 40.   Yet both DHS and ICE have failed to remedy these deficiencies.   DHS and ICE assert that they have sufficiently addressed the withheld records at issue in their initial or supplemental declarations, or that certain records need not have been addressed to begin with.   Both assertions are untrue.   Because DHS's and ICE's *Vaughn* indices remain "deficient in a critical way," the Court "must deny the [Agencies'] motion for summary judgment"—and grant the Institute's motion for summary judgment—"so far as it relates to withholdings not described in [their] *Vaughn* ind[ices]."   *Davidson v. U.S. Dep't of State*, 206 F. Supp. 3d 178, 193–94  (D.D.C. 2016) (internal quotation marks and citation omitted), *aff'd*, 728 F. App'x 7 (D.C. Cir. 2018).

### A.   DHS's Supplemental Declaration Fails To Address Several Records Released In This Case and To Justify Withholdings from Newly Included Records.

DHS has still failed to provide any explanation for its withholding of information from certain documents.   Moreover, its supplemental *Vaughn* index also fails to justify some of the information withheld from responsive records it produced in this case.

*First*, DHS has failed to explain its withholding of information from hundreds of pages of documents that were produced to the Knight Institute in this case.[19]  It mistakenly argues that it "did not release any documents in this case bearing Bates numbers beginning with th[e] prefix [513-] and thus did not withhold any information from any such documents."  Defs.' Reply Br. at 35.  But DHS produced to the Institute two sets of records bearing that prefix.  On April 30, 2018, DHS's Director of FOIA Appeals and Litigation, Kevin Tyrell, sent the Institute a letter stating that "[t]he 142 pages for release are attached and bates stamped DHS-001-513-000208 to DHS-01-513-000350."  Hellman Decl. Ex. CC at 2.  And on May 30, 2018, Mr. Tyrell sent the Institute another letter stating that "[t]he 753 pages for release are attached and bates stamped DHS-001-513-00351 to DHS-01-513-001103."  Hellman Decl. Ex. V at 1.[20]  Moreover, both parties discussed these productions in the sixth and seventh joint status reports filed on May 21, 2018 and June 29, 2018, respectively.  *See* 6th Joint Stat. Report at 2, ECF No. 29; 7th Joint Stat. Report at 1.  Not only did DHS produce these documents to the Institute at the outset, but it has also seen them since, in the course of summary judgment briefing.  *See* Hellman Decl. Ex. Z (a document Bates-stamped DHS-001-513-000351).[21]

*Second*, though DHS has now addressed other previously omitted documents in its supplemental declaration and *Vaughn* index, it still fails to justify the withholding of certain of those documents under Exemption 5.  DHS invokes the deliberative process privilege, the

---

[19] DHS failed to adequately address the following pages of documents, which contain withheld information, in its declarations or *Vaughn* index: DHS-001-00513-000001–262, DHS-001-00513-000-268–70, DHS-001-00513-000281–98, DHS-001-00513-000303–07, DHS-001-00513-000351–715, DHS-001-00513-000739–752, DHS-001-00513-000978–1103.

[20] These documents may have been produced under a different prefix because they had already been produced to a different organization, Muslim Advocates, in response to a similar FOIA request.  *See* 7th Joint Stat. Report at 1, ECF No. 30.  Nonetheless, DHS bears the burden of justifying its withholding of responsive information from these documents, which it has repeatedly failed to do.

[21] Thirty-one documents in the "513" Bates-stamped series are, like Exhibit Z, withheld in full.

attorney work-product privilege, and the attorney-client privilege in withholding information from three memoranda authored by CRCL and the Office of General Counsel ("OGC").[22] According DHS's supplemental *Vaughn* index, each of these memoranda informs CBP (or ICE) that CRCL is retaining a complaint for investigation. Suppl. DHS *Vaughn* Index at 42–43. DHS claims that these records were properly withheld under the deliberative process privilege, the attorney-client privilege, and the attorney work-product privilege. None of those privileges applies to these records. As an initial matter, DHS fails to identify the "final decision" connected to the records, noting only that the decisions related to "how the complaints would be handled." *Id.* Thus, the deliberative process privilege does not apply. *See Judicial Watch, Inc.*, 2019 WL 4644029, at *8. Second, to invoke the attorney-client privilege, DHS is required to "demonstrat[e] . . . confidentiality both at the time of the communication *and maintained since*." *Am. Oversight,* 311 F. Supp. 3d at 342 (emphasis added). Yet the *Vaughn* index entry lacks any assertions of confidentiality, much less a demonstration that confidentiality has been maintained since the records were created in 2014. *See* Suppl. DHS *Vaughn* Index at 42–43. Finally, despite invoking the attorney work-product privilege, DHS describes the anticipated litigation at issue in these memoranda in only the broadest terms—stating, for example, that the withheld information was created in anticipation of litigation "regarding the search of electronic devices at the border," *id.* at 43, and making no assertions regarding anticipated litigation related to the particular complaints that led to the investigations. The work-product privilege thus does not apply. *See Ellis*, 110 F. Supp. 3d at 108 (requiring "some indication of the type of litigation for which the document's use is at least foreseeable").

---

[22] *See* 2d Hellman Decl. Exs. JJ, KK, LL.

DHS has also failed to explain its withholding, under Exemption 5, of information from a complaint submitted by a transgender merchant marine alleging harassment because of his gender identity.  *See* 2d Hellman Decl. Ex. MM at DHS-001-00585-001998 (paragraph beginning "as a policy matter, we should . . .").  DHS's supplemental *Vaughn* index only addresses withholdings under Exemptions 6 and 7(E).  *See* Suppl. DHS *Vaughn* Index at 31–33.

**B.**   **ICE's Supplemental Declaration Does Not Justify the Deficiencies in its *Vaughn* Index.**

ICE has also failed to describe hundreds of withheld records in its *Vaughn* index.  *See* Pl.'s MSJ Br. at 40 n.51.  ICE asserts that the Knight Institute agreed that the agency could produce a limited *Vaughn* index in this case, and that in any event, the documents not included in its *Vaughn* index are Reports of Investigation ("ROIs"), the justifications for which are the same as the justifications for the withholdings in the ROIs that were included in the *Vaughn* index. *See* Defs.' Reply Br. at 32–33.  Neither assertion is true.

*First*, the Knight Institute never agreed that ICE could rely on a partial *Vaughn* index in support of its summary judgment motion.  ICE offered to provide the Knight Institute with a draft, sample *Vaughn* index years ago, in the hope of an early dismissal from this case.  *See* Defs.' Reply Br. at 32; 6th Joint Stat. Report at 6; 7th Joint Stat. Report at 2; 8th Joint Stat. Report at 7, ECF No. 31; 9th Joint Stat. Report at 3, ECF No. 32.  But the Knight Institute never agreed that the justifications contained in that draft, sample *Vaughn* index were sufficient, and accordingly never agreed to dismiss ICE from the case.  DHS and CBP subsequently referred other records to ICE for processing, which necessarily were not included in the draft, sample *Vaughn* index ICE had previously prepared.  *See* 14th Joint Stat. Report at 3, ECF No. 43 ("Defendants also agreed to plaintiff's proposal, made the previous day, that the parties meet and confer the week after October 1, 2019, the date by which ICE anticipated completing its work on

the pages referred to it by CBP, to discuss 'the scope of [plaintiff's] anticipated challenges.'"); *see also* 10th Joint Stat. Report at 2, ECF No. 34; 11th Joint Stat. Report at 2, ECF No. 39; 12th Joint Stat. Report at 2–4, ECF No. 40; 13th Joint Stat. Report at 1, ECF No. 41; 14th Joint Stat. Report at 2; 15th Joint Stat. Report at 1, ECF No. 44.   Ultimately, the Institute made clear that it would continue to challenge ICE's withholdings on the parties' cross-motions for summary judgment.  *See* 15th Joint Stat. Report at 1 (stating intent to challenge "the validity of ICE's withholdings under FOIA Exemptions 5, 6, 7(A), 7(C), and 7(E)").   ICE bore the burden of justifying all of the challenged withholdings on summary judgment, *Stein*, 134 F. Supp. 3d at 468, and it clearly failed to meet that burden.

*Second*, not all of the records containing withholdings appear to be ROIs, and therefore ICE cannot simply rely on its existing, incomplete *Vaughn* index to justify its withholdings. Some are memoranda explaining policy changes to field operations teams.  *See* 2d Hellman Decl. Exs. NN, OO.  Others are other investigatory records that were submitted in response to CRCL inquiries; these might contain similar information, but they serve a different purpose than ROIs. *Id.* Ex. PP.  Thus, any justification for withholding information from ROIs does not suffice for withholding information from those documents.

*Third*, ICE has not released all segregable information in these documents.  *Davidson*, 206 F. Supp. 3d at 193.  For example, several complete pages of records, which seem to be part of a CRCL investigation, were withheld in full under Exemptions 6, 7(C), or 7(E).[23] Additionally, in a summary of an interview, 2d Hellman Decl. Ex. PP, there is a half-page long addendum to the interview that is entirely withheld under Exemptions 6 and 7(C).  Nothing in

---

[23] *E.g.*, 2017-ICLI-00011 2278–86 (withheld in full)   Documents withheld in full are not included as exhibits, but can be sent to the Court on request.

ICE's draft, sample *Vaughn* index would support such extensive withholdings.  Thus, ICE's *Vaughn* Index remains inadequate.

## CONCLUSION

For the reasons stated above, the Agencies have failed to justify their withholding of information responsive to the Knight Institute's Request. Accordingly, this Court should grant summary judgment in favor of the Institute and order the Agencies to release the withheld information at issue. Alternatively, the Knight Institute respectfully asks the Court to order the Agencies to submit supplemental declarations to determine the propriety of their withholdings, or to conduct an *in camera* review of the documents at issue, and to identify any non-exempt or segregable information for prompt production to the Institute.

July 31, 2020                                                     Respectfully submitted,

 */s/ Matthew S. Hellman*                                  */s/ Caroline M. DeCell*
Matthew S. Hellman (484132)                       Caroline M. DeCell (1015491)
JENNER & BLOCK LLP                                  Stephanie C. Krent, *Pro Hac Vice*
1099 New York Avenue, NW                         KNIGHT FIRST AMENDMENT INSTITUTE AT
Suite 900 Washington, DC 20001                       COLUMBIA UNIVERSITY
T: (202) 639-6000                                          475 Riverside Drive, Suite 302
F: (202) 639-6066                                          New York, NY 10115
mhellman@jenner.com                                    T: (646) 745-8500
                                                                 carrie.decell@knightcolumbia.org
Ethan Wong (admission pending)                   stephanie.krent@knightcolumbia.org
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
T:(212) 891-1600
F: (212) 090-0894
ewong@jenner.com

*Counsel for Plaintiff*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to all authorized CM/ECF filers.

By:    */s/ Matthew S. Hellman*
Matthew S. Hellman