**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY,** | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 17-cv-0548 (TSC) |
| **DEPARTMENT OF HOMELAND SECURITY,** *et al.,* | ) ) ) ) | |
| Defendants. | ) ) ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Knight First Amendment Institute at Columbia University ("Knight Institute")

brings this case against Defendants Department of Homeland Security ("DHS"), and two of its

components, Customs and Border Protection ("CBP"), and Immigration and Customs

Enforcement ("ICE") (collectively, "the Agencies"), under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552. Am. Compl., ECF No. 10, ¶ 1. At the time this action was filed, Knight

Institute had received no response to its FOIA requests for access to certain records. *Id.* ¶¶ 1–2.

Subsequently, DHS, CBP, and ICE finished processing Knight Institute's FOIA requests, and the

Agencies moved for summary judgment. Defendants' Motion for Summary Judgment ("Defs'

MSJ"), ECF No. 46. Knight Institute cross-moved for summary judgment. Plaintiff's Cross-

Motion for Summary Judgment ("Pl.'s MSJ"), ECF No. 50-1. For the reasons set forth below, the

court will GRANT in part and DENY in part the Agencies' motion and DENY Knight Institute's

cross-motion.

## I.    BACKGROUND

On March 15, 2017, Knight Institute filed a FOIA request with DHS and ICE, seeking several categories of records regarding the government's searches of individuals' electronic devices when they crossed the border into the United States.  Knight Institute filed an identical FOIA request with CBP on March 22, 2017.  Am. Compl. ¶¶ 17–18, 21.  Having received no response to its request, Knight Institute filed suit on March 27, 2017, Compl., ECF No. 1, and filed an amended complaint on April 19, 2017.  Amend. Compl.  The requests sought a large number of records, and the parties reached a series of agreements regarding the searches to be performed.  *See, e.g.*, 3d Joint Status Report ("JSR"), ECF No. 24; 4th JSR, ECF No. 25.  The Agencies subsequently released thousands of pages of records, although many were heavily redacted and others were withheld in full.  Pl.'s MSJ at 2.  Knight Institute challenges the Agencies' invocation of FOIA Exemptions 5, 6, 7(C) and 7(E) by DHS, CBP, and ICE.  *Id.*

During briefing, certain previously contested issues were resolved to Knight Institute's satisfaction.  *See, generally,* Plaintiff's Reply Memorandum ("Pl.'s Rep."), ECF No. 60.  Accordingly, the court will address only the remaining issues in dispute between the parties.

## II.    STANDARD OF REVIEW

"The fundamental principle animating FOIA is public access to government documents." *Waterman v. IRS*, 61 F.4th 152, 156 (D.C. Cir. 2023) (cleaned up).  To obtain an order requiring an agency to release documents, a requester must show that the agency has improperly withheld responsive agency records.  *See Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 (1989); *see also* 5 U.S.C. § 552(a)(4)(B).  The court reviews *de novo* the agency's assertion of FOIA exemptions to withhold information, and the agency bears the burden of showing that the withheld information falls within the exemption claimed.  5 U.S.C. § 552(a)(4)(B); *see also DiBacco v. Dep't of the Army,* 926 F.3d 827, 834 (D.C. Cir. 2019).  An agency's justification for invoking a particular

FOIA exemption "is sufficient if it appears 'logical' or 'plausible.'" *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). FOIA cases are typically resolved on motions for summary judgment. *See Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment is appropriate if a moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The court may grant summary judgment in a FOIA case based solely on the government's supporting affidavits or declarations if they are "relatively detailed and nonconclusory, and . . . submitted in good faith." *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (cleaned up). Such affidavits and declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.* (cleaned up).

### III.    ANALYSIS

### A.    FOIA EXEMPTION 5

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5); *Dep't of the Interior v. Klamath Water Users Prot. Ass'n,* 532 U.S. 1, 8 (2001). The exemption protects records that ordinarily would be privileged in the civil discovery context, and thus encompasses the deliberative process privilege, the attorney-client privilege, and the attorney work-product doctrine. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148–49 (1975) ("*NLRB*"); *Waterman v. IRS*, 61 F.4th 152, 156–157 (D.C. Cir. 2023). The Exemption 5 challenge remaining here primarily focuses on the application of the deliberative process privilege.

The deliberative process privilege applies to information that is both "predecisional and deliberative." *U.S. Fish & Wildlife Serv. v. Sierra Club*, 141 S. Ct. 777, 788 (2021); *Machado v.*

*Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020). "A document is predecisional if it was 'generated before the agency's final decision on the matter' and deliberative if it was 'prepared to help the agency formulate its position.'" *Waterman*, 61 F.4th at 156 (quoting *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 786). The privilege applies to documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB*, 421 U.S. at 150 (internal quotation omitted).The deliberative process privilege also protects factual material that is closely intertwined with opinions, recommendations, and deliberations. *See Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011). "[T]he legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Id.* Thus, "purely factual material usually cannot be withheld under Exemption 5 unless . . . the selection or organization of the facts was part of the agency's deliberative process." *Waterman*, 61 F.4th at 158 (quoting *Ancient Coin Collectors Guild*, 641 F.3d at 513) (cleaned up).

Knight Institute argues that the Agencies have failed to demonstrate that Exemption 5 applies to six categories of documents. Pl.'s MSJ at 11.

### 1.   DHS Withholdings

First, Knight Institute challenges DHS's redaction of certain portions of the Office of Civil Rights and Civil Liberties ("CRCL") Impact Assessment of Border Searches of Electronic Devices ("CRCL Impact Assessment"), withheld pursuant to the deliberative process privilege. Pl.'s Rep., at 2–3. Knight Institute argues that DHS failed to identify any specific final agency decision or policy to which the redacted information refers. *Id*.

According to DHS, the need for the CRCL Impact Assessment dates back to August 2009, "when the Secretary of Homeland Security 'announced revised [ICE] and [CBP] policies with respect to searches of electronic devices in response to public and congressional concern, and as part of the continuing evolution of border security policy.'" Defendants' Combined Reply in Support of Their Motion for Summary Judgment ("Defs' Rep."), ECF No. 57, at 2, quoting CRCL Impact Assessment, ECF No. 50-18, at 1. At that time, "'the Secretary directed that CRCL assess the impact of the policies, to ensure that civil rights and civil liberties are appropriately addressed and to look for ways in which the new policies might be improved.'" *Id.* CRCL then reviewed CBP and ICE policies regarding the search of electronic devices at the border, which included "'consider[ing] [the] legal, policy, and practical concerns raised by advocacy groups and the public.'" *Id*. at 3.

DHS withheld information under the headings "Fourth Amendment, Border Search Authority," "Fourth Amendment, Electronic Devices at the Border," "First Amendment," and "Equal Protection and Religious/Ethnicity Discrimination." Pl.'s Rep. at 2. These withholdings are contained in the "section of the impact assessment . . . [that] examined the lawfulness of CBP and ICE policies governing searches of electronic devices at the border and concluded the policies are lawful." Supplemental Declaration of James V.M.L. Holzer ("2d Holzer Decl."), ECF No. 57-1, ¶ 16. DHS states that it "redacted legal analyses proffered by CRCL to the DHS Secretary relative to CBP's border search authority, authority to search electronic devices at the border, and First Amendment considerations," because "CRCL's recommendations and the arguments in favor of those recommendations were intended to advise the Secretary 'and do not purport to state the current position of the Department.'" DHS *Vaughn* Index, ECF No. 57-1, at 22; 2d Holzer Decl., ¶ 17. According to DHS, the CRCL employees who created the document did not have decision-

making authority to compel CBP, ICE or the Secretary of DHS to adopt the recommendations and/or analyses contained in the CRCL Impact Assessment.  DHS *Vaughn* Index at 21.

Knight Institute argues that DHS has "failed to identify any decision to which the information relates, and thus it failed to demonstrate that the information is predecisional."  Pl.'s MSJ at 15; *see* Pl.'s Reply at 2–4.  It relies on *Judicial Watch, Inc. v. U.S. Dep't of Just,* 2019 WL 4644029, at *8 (D.D.C. Sept. 24, 2019) (*Judicial Watch I*), arguing that it "requir[es] agencies to identify 'final policies or decisions[] connected with [the] entries.'"  Pl.'s Rep. at 3, quoting *Judicial Watch I*, at *8.

Knight Institute misreads *Judicial Watch I.*  In that case, the court found that the government's explanation of the basis for its assertion of the deliberative process privilege was "too vague," and did not "provide enough information about the processes, decisions, or policies at issue."  *Id.*, 2019 WL 4644029, at *8.  The court did not require that a final decision or policy exist, only that the information withheld related to some identified decision or policy "at issue," which would include a decision or policy merely being contemplated. [1]  *Id.*

In fact, the Supreme Court has recognized, as Knight Institute concedes, that "agencies may sometimes 'generate memoranda containing recommendations which do not ripen into agency decisions' but which are nevertheless privileged."  Pl.'s Rep. at 4, quoting *NLRB*, 421 U.S. at 151 n.18.  Thus, DHS's failure to point to a final decision resulting from the CRCL Impact Assessment is not fatal to its deliberative process privilege claim for certain information contained within the assessment.  DHS has established that this document was created to examine "the lawfulness of

---

[1]  Knight Institute's reliance on *SafeCard Services*, 926 F.2d at 1204, also is misplaced.  Pl.'s Rep. at 3.  In that case, the D.C. Circuit's reference to needing to know whether the withheld information explains the reason for an agency decision was because an agency decision had been made, so the issue was whether the withheld information was predecisional to that specific decision.  926 F.2d at 1204.

CBP and ICE policies governing searches of electronic devices at the border" and included a section containing recommendations based on the law and policy review.  2d Holzer Decl. ¶ 16. This satisfies DHS's obligation to "show that the document was generated as part of a *definable* decision-making process."  *100Reporters LLC v. U.S. Dep't of Just.,* 248 F. Supp. 3d 115, 151 (D.D.C. 2017) (emphasis in original) (quotations marks and citation omitted).

Knight Institute also contends that DHS's withholding of the CRCL Impact Assessment's analyses is inconsistent, because DHS released the conclusion reached from these analyses.  Pl.'s MSJ at 15.

Knight Institute's argument, however, is unavailing.  It is tantamount to claiming that if a final recommendation or opinion is disclosed then any information supporting or informing that recommendation or opinion must be released.  Knight Institute cites no support for this argument. *See* Pl.'s MSJ at 15.  Indeed, such a position is contrary to well-established law holding that only recommendations and opinions that were expressly adopted or incorporated by reference into the final decision lose their predecisional status.  *See*, *e.g.*, *NLRB*, 421 U.S. at 161; *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 10 (D.C. Cir. 2014).  Knight Institute points to no evidence suggesting that the withheld information was expressly adopted into a final decision or policy.  Under such circumstances, Exemption 5 applies to the CRCL Impact Assessment's analyses notwithstanding the release of the conclusions reached from those analyses.

In sum, Knight Institute fails to undermine DHS's showing that the CRCL Impact Assessment was a predecisional, deliberative document designed to "'offer[] policy advice to Department and Component leadership about how to improve accountability, oversight, and notice about redress.'" concerning border searches of electronic devices.  2d Holzer Decl. ¶ 17, quoting

CRCL Impact Assessment at 1. Consequently, DHS properly asserted Exemption 5 to withhold the information at issue.[2]

Second, Knight Institute challenges DHS's withholding of a one-page "draft document, authored by an unidentified CRCL employee, [that] contains the employee's evaluation of and opinions about the effectiveness of DHS policies in safeguarding the rights of the public during searches of electronic devices at the border." DHS *Vaughn* Index, ECF No. 46-3, at 15. *See* Pl.'s MSJ at 13–14; Pl.'s Rep. at 4–5. Knight Institute again argues that Exemption 5 is inapplicable because DHS failed to identify any final policy or decision to which this document relates. Pl.'s MSJ at 14. It also claims that DHS failed to show that this document was part of a deliberative process that never resulted in a final decision. Pl.'s Rep. at 5.

DHS responds that the document is "'internal [draft] briefing material authored . . . for consideration of the DHS Secretary.'" Defs' Rep. at 5, quoting 2d Holzer Decl. ¶ 11. The Holzer Declaration states that the document "reflected the subjective observations, opinions, suggestions, and recommendations of CRCL personnel as to what the Secretary should take into consideration when deciding whether or not to modify current policies and procedures[]" regarding border searches of electronic devices. 2d Holzer Decl. ¶ 11. DHS further attests that the document's author "did not have authority to make a final agency decision" regarding the recommendations contained in the document, and that the document itself did not constitute a final decision. *Id.*

---

[2] DHS has also asserted the attorney-client privilege for the redacted information in the CRCL Impact Assessment. 2d Holzer Decl. ¶ 18. Knight Institute challenges the assertion of the privilege, arguing that DHS failed to demonstrate that the redacted information has been kept confidential. Pl.'s Rep., at 4, n.2. Given the court's holding concerning the applicability of the deliberative process privilege, it need not reach the question of whether the attorney-client privilege also protects the same withheld information. *Coleman v. Lappin*, 607 F. Supp. 2d 15, 23 (D.D.C. 2009) ("If the Court determines that information properly is withheld under one exemption, it need not determine whether another exemption applies to that same information.").

Knight Institute does not contest that the document is not a final decision, that it was not authored by a final decisionmaker, or that it contains opinions and recommendations that would constitute deliberative material. Instead, it argues that because the Holzer Declaration refers to the document as being "part of the Agency's continuing process of examining its policies guiding the border search of electronic devices," DHS has failed to identify the specific deliberative process at issue or how this specific document was a part of that process. 2d Holzer Decl. ¶ 11.

This argument fails, however, because DHS expressly identified the deliberative process to be that of examining the agency's policies regarding border searches of electronic devices in order to aid the DHS Secretary's assessment of the overall Department policies on the subject. 2d Holzer Decl., ¶¶ 11, 16–17. Thus, contrary to Knight Institute's claim, DHS did not merely identify an "unspecified agency policy" to which this document was connected. Pl.'s Rep. at 5.

This is different from the inadequate description challenged in *Hunton & Williams LLP v. U.S. EPA*, 248 F. Supp. 3d 220, 242–45 (D.D.C. 2017), on which Knight Institute relies. Pl.'s Rep. at 5. There, the court concluded that the government's *Vaughn* index failed to sufficiently identify the nature of the specific deliberative process involved. *See Hunton & Williams LLP*, 248 F. Supp. 3d at 242–43. There was no such failure here.

Third, Knight Institute challenges whether Exemption 5 applies to a memorandum from the DHS General Counsel to the DHS Secretary that, according to the Holzer Declaration, "was a part of the Agency's ongoing process of examining policies relative to the search of electronic devices at the border as well as associated litigation considerations [addressing] the potential impact of policy decisions on prior or anticipated litigation against the Agency arising from searches of electronic devices at the border." Pl.'s Rep. at 5–6, quoting 2d Holzer Decl. ¶¶ 13, 15. Knight Institute again argues that DHS has identified no applicable policy decision, nor does it

9

"specify the litigation at issue." Pl.'s Rep. at 6.  But as explained above, DHS is not required to identify a specific policy decision resulting from its deliberations.  It is sufficient that it identified a specific policy under consideration.  *See supra* p. 8.  Knight Institute also provides no support for its claim that DHS must identify the specific litigation at issue.  Litigation concerning a policy or decision may be anticipated as a general matter when a policy or decision is being contemplated, especially when there has been prior litigation concerning the issues under consideration, and deliberations addressing such potential litigation would still be protected as part of the decision-making process.  *See, e.g., In re Sealed Case*, 146 F.3d 881, 885–86 (D.C. Cir. 1998) (applying attorney work-product protection to materials prepared in anticipation of litigation about a specific issue even if no specific claim has arisen);  *Delaney, Migdail & Young, Chartered v. IRS,*  826 F.2d 124, 127 (D.C. Cir. 1987) (recognizing that Exemption 5 includes documents prepared in anticipation of litigation even where no specific claim is contemplated).[3]

The court will therefore grant summary judgment to DHS on its Exemption 5 claim.

### 2.    CBP Withholdings

Asserting the deliberative process privilege, CBP withheld in full "spreadsheets detailing border searches of electronic devices and related statistical analysis" which provide analyses of the searches performed, explain the reasons for the search, and provide biographic information regarding the subjects of the search.  CBP *Vaughn* Index, ECF No. 46-4, at 27–30.  CBP contends that the spreadsheets "reflect the ongoing exchange of information between CBP and CRCL to allow CRCL to gain information about CBP's policies, with the anticipation of further policy

---

[3] Although DHS also asserted attorney-client and work-product privileges for this memorandum, 2d Holzer Decl. ¶ 15, given the court's holding concerning the applicability of the deliberative process privilege, it need not reach the question of whether the attorney-client or work-product privileges also protect the withheld information.  *Coleman*, 607 F. Supp. 2d at 23.

recommendations to agency leadership." Second Declaration of Patrick A. Howard ("2d Howard Decl."), ECF No. 57-2, ¶ 12.

In a supplemental filing, Knight Institute argues that CBP has failed to demonstrate that the spreadsheet data withheld is part of the deliberative process recognized by the D.C. Circuit in *Judicial Watch, Inc. v. U.S. Dep't of Just.,* 20 F.4th 49 (D.C. Cir. 2021) (*Judicial Watch II*). *See* Plaintiff's Notice of Supplemental Authority ("Pl.'s Supp."), ECF No. 61, at 2.[4] In *Judicial Watch II*, the D.C. Circuit reiterated that in order to invoke Exemption 5, an agency "must show (1) what deliberative process is involved, and (2) the role played by the document at issue in the course of that process. To assist the court in determining whether the privilege is available, the agency should also explain (3) the nature of the decisionmaking authority vested in the officer or person issuing the disputed document, and (4) the relative positions in the agency's chain of command occupied by the document's author and recipient." *Judicial Watch II*, 20 F.4th at 55 (cleaned up).

Knight Institute contends that CBP provided a vague description of the spreadsheet data it seeks to withhold, "claiming only that the spreadsheet 'contains information that *might* someday be used to make policy recommendations.'" Pl.'s Supp. at 2, quoting Pl.'s Rep. at 7 (emphasis in original). Aside from the fact that Knight Institute quoted itself from a prior brief, and not a CBP assertion, *see* Pl.'s Rep. at 7, Knight Institute mischaracterizes CBP's showing of the predecisional, deliberative nature of the spreadsheets.

CBP attests that "[t]hese records were created for the specific purpose of evaluating whether changes to policies might be necessary and to make recommendations to agency

---

[4]  Knight Institute also relies on this case to argue that DHS's assertions regarding Exemption 5 are insufficient with respect to the decision-making process. Pl.'s Supp. at 2. But as the court concluded above, DHS has sufficiently explained its decision-making process and the role the withheld deliberative information played in that process. *See supra* pp. 4–10.

leadership regarding potential changes to those policies." 2d Howard Decl. ¶ 12. Those policies pertain to the performance of border searches of electronic devices, and the spreadsheets were created "to inform policymakers on whether to make recommendations to departmental decision makers regarding border searches of electronic devices." *Id.* ¶ 13. The spreadsheets were shared with CRCL, which in turn was tasked with providing the DHS Secretary with information on border searches of electronic devices so that the Secretary, the ultimate decision-maker, could decide whether to change any policies regarding such searches. *See id*. ¶¶ 12–13. CBP's description of the decision-making process therefore satisfies *Judicial Watch II*'s requirements.

Knight Institute also argues that the purely factual information in the spreadsheets must be released. Pl.'s MSJ at 15–16; Pl.'s Rep. at 7–8. CBP responds that the spreadsheets are predecisional and deliberative because they were "obtained, compiled, or created by CRCL in relation to their review of CBP law enforcement activities, including activities relating to border searches of electronic devices." 2d Howard Decl., ¶ 10. This description fails to meet CBP's obligation to address whether factual information in deliberative documents can be segregated and released.

As noted above, factual information may not be withheld pursuant to Exemption 5. *See supra* p. 4. The deliberative process privilege protects factual materials only when they are inextricably intertwined with opinions, recommendations, and deliberations. *See, e.g., Ancient Coin Collectors Guild*, 641 F.3d at 513.

Knight Institute is correct that CBP does not claim "the facts contained in these spreadsheets are 'inextricably intertwined'" with the deliberative process. Pl.'s Rep. at 8. The fact that the information is part of the overall deliberative process is insufficient. CBP does not explain whether the "selection or organization of the facts" contained in these spreadsheets was

itself part of the deliberative process. *See* [First] Declaration of Patrick A. Howard ("1st Howard Decl."), ECF No. 46-4, ¶¶ 11–12; CBP *Vaughn* Index at 27–30; 2d Howard Decl., ¶¶ 9–13. Accordingly, the court denies without prejudice CBP's motion for summary judgment as it pertains to the application of Exemption 5 to CBP's spreadsheets.[5] CBP may renew its motion with respect to the application of Exemption 5 to these spreadsheets or to release the segregable factual information.

## B.    FOIA EXEMPTIONS 6 AND 7(C)

Exemption 6 permits the withholding of "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  In assessing the applicability of Exemption 6, courts weigh the "privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy." *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 46 (D.C. Cir. 1999); *see also Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 43 (D.D.C. 2004).

Exemption 7(C) exempts from disclosure information compiled for law enforcement purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  As with Exemption 6, determining whether information has been properly withheld under Exemption 7(C) requires balancing the individual's right to privacy against the public's right of access to the information requested.  "[T]he only

---

[5] CBP also asserted Exemptions 6 and 7(C) and 7(E) with respect to these spreadsheets.  CBP *Vaughn* Index at 27–30.  It is unclear, however, if these exemptions completely cover the information withheld under Exemption 5, and thus CBP must adequately justify the application of Exemption 5 to these spreadsheets. *Coleman*, 607 F. Supp. 2d at 23 (noting that Exemptions 6 and 7(C) are not coextensive and that if information is properly withheld under one exemption the court need not decide whether another exemption applies).

relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier,* 164 F.3d at 46 (quoting *U.S. Dep't of Def. v. F.L.R.A.*, 510 U.S. 487, 497 (1994)) (alterations in original). "Information that 'reveals little or nothing about an agency's own conduct' does not further the statutory purpose." *Beck v. U.S. Dep't of Just.*, 997 F.2d 1489, 1493 (D.C. Cir. 1993). Where a legitimate privacy interest is implicated, the requester must (1) "show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and (2) "that the information is likely to advance that interest." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 158 (2004) ("*Favish*"). If a document invades a third party's privacy and sheds no light on government functions, it may be withheld under Exemption 7(C). *See, e.g., U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 774 (1989) ("*Reporters Committee*").

Knight challenges CBP's withholding, pursuant to Exemptions 6 and 7(C), of four categories of information: the traveler's country of birth, ethnicity, citizenship, and occupation. Pl.'s Rep. at 9–16. This court need only consider the withholdings under Exemption 6 if it concludes that Exemption 7(C) does not apply. *See Reporters Committee*, 489 U.S. at 762 n.12 ("Because Exemption 7(C) covers this case, there is no occasion to address the application of Exemption 6."). Knight Institute addressed only Exemption 7(C) in its motion for summary judgment, apparently conceding that Exemption 6 need not be separately addressed. Pl.'s MSJ at 20, n.29.

CBP explains that each time a traveler crossing the border is subjected to an electronic devices search, an Electronic Media Report ("EMR") is created. Defs' Rep. at 14; 2d Howard

14

Decl., ¶ 16.  The EMR contains detailed information about the traveler, including the traveler's country of birth, ethnicity, citizenship, and occupation.  Defs' Rep. at 13–15; 2d Howard Decl., ¶¶ 15–17.

Knight Institute emphasizes that it does not challenge the withholding of information that could clearly identify a traveler subject to an electronics device search, such as the traveler's name, date of birth, passport number, and the like.  *See* Pl.'s MSJ at 22 n.36; Pl.'s Rep. at 10.  Instead, it challenges the withholding of a traveler's "country of birth, ethnicity, citizenship, and occupation[]," on the grounds that disclosure of this information involves no more than a "*de minimis* privacy interest,*" if that, as such disclosure would be extremely unlikely to identify a particular person.  Pl.'s Rep. at 9 n.9, 11.  Knight Institute argues that there is no substantial privacy interest in these categories of information, which constitutes only "'bits' of information about an individual" who is part of a large pool of other profiles.  *Id.* at 11.

CBP responds that the release of this information could result in the identification of a traveler subjected to an electronics device search at the border.  For example, CBP posits that releasing information that an Italian accountant, whose electronic device was searched, just returned from a two-week trip to Japan creates a substantial likelihood that his "friends, neighbors, and clients" would recognize the description of someone they know.  Defs' Rep. at 17; 2d Howard Decl., ¶¶ 19–20.  Knight Institute counters that CBP provides no evidence that the number of Italian accountants returning from a two-week trip to Japan on a particular day are so few that release of this information would allow a particular person to be identified.  Pl.'s Rep. at 12.

CBP's second hypothetical concerns the possibility that a female professor from Spain with two children who teaches anthropology might be identified by her students who knew of her travel plans.  Defs' Rep. at 17; 2d Howard Decl., ¶ 26.  Knight Institute responds that CBP can redact

the number of traveling companions, and that without identifying the university where the professor teaches it is unlikely that she could be identified by her students.  Pl.'s Rep. at 13.

Knight Institute is correct that CBP's hypotheticals are to some degree faulty.  Not only is Knight Institute not seeking the number of traveling companions, but it is not seeking information that identifies the country the traveler visited or the duration of the visit.  Instead, it seeks only a traveler's country of birth, ethnicity, citizenship, and occupation, to add to the information CBP already has released, consisting of the date and time of the search, and the gender and race of the individual.  2d Howard Decl., ¶ 26.

CBP's hypotheticals become less persuasive when stripped of the information that Knight Institute is not requesting.  Moreover, withholding the traveler's occupation would make identification even less likely.  Nonetheless, because the court seeks additional information concerning the public interest part of the analysis, as explained below, the court will grant the parties an additional opportunity to address the issue of the privacy interests at stake, focusing narrowly on the information CBP has released, and the four categories of information Knight Institute still seeks.[6]

If the court concludes that CBP adequately shows that the withheld information, when combined with other information likely to be known about that individual by others, could identify a particular individual, the next question is whether release of this information could reasonably be expected to cause an unwarranted invasion of personal privacy.  Knight Institute argues that releasing information pertaining to a traveler's country of birth, ethnicity, citizenship, and occupation involves "minimal" privacy interests.  Pl.'s MSJ at 21.

---

[6]  It is unclear whether CBP releases the border location where the search takes place, which would be relevant to the issue of traveler identification.

But the release of this information would not occur in a vacuum.  The information is directly tied to documents created by CBP concerning travelers who have been stopped at the border and had their electronic devices searched.  Release of potentially identifying information in this context would impinge on the privacy interests of travelers, who likely would not want to be associated with law enforcement actions.  Courts have repeatedly concluded that there is a substantial privacy interest in not being identified in connection with a law enforcement action.  *See, e.g.*, *Nation Magazine, Wash. Bur. v. U.S. Customs Serv.,* 71 F.3d 885, 896 (D.C. Cir. 1995) (and the cases cited therein).

Moreover, border searches of electronic devices are not always performed on a purely random basis.  They can also be done on a targeted basis for national security concerns, law enforcement interests, officer safety issues and other CBP operational matters.  *See* 2d Howard Decl., ¶ 37.  An individual whose electronic devices were searched at the border might be suspected of having been targeted for one of these reasons.  Thus, contrary to Knight Institute's claim, if release of the information that Knight Institute still seeks could potentially identify a specific person, there would be substantial privacy interests to be weighed against the public interest in disclosure.

The D.C. Circuit has held that Exemption 7(C) applies to law enforcement records that implicate the privacy interests of third parties unless there is an overriding public interest in disclosure.  *See Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003).  To demonstrate an overriding public interest in disclosure, the requester must show that release of the withheld information will shed light on unlawful conduct by a government agency or employee.  *Reporters Committee*, 489 U.S. at 772–73.  In addition, the Supreme Court in *Favish* made clear that when the asserted public interest rests on a claim that government officials acted improperly

in performing their duties, the requester "must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174.  Merely asserting possible agency misconduct is not enough.  The requester must demonstrate that "disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker*, 349 F.3d at 661 (quoting *SafeCard Servs.*, 926 F.2d at 1206.)  The requester must also demonstrate that the disclosure is "likely to advance" the alleged "reason for the disclosure." *Favish*, 541 U.S. at 172.

Knight Institute argues that there is a public interest in knowing whether CBP is engaging in border searches of electronic devices when there is no suspicion that would warrant such a search.  It points to purported "widespread reports that border officers were targeting journalists and Muslims, including Muslim Americans, in exercising their broad discretion to conduct these invasive searches." Pl.'s MSJ at 23.  Yet in its summary judgment briefing, Knight Institute produces no compelling evidence that CBP has engaged in illegal activity in connection with its border searches.  The press releases and news stories Knight Institute identifies concern complaints made regarding certain CBP border searches.  Pl.'s MSJ. at 23–24, citing Pl. Statement Pursuant to LCvR 7(h)(1), ECF No. 48-2, ¶ 5.  The fact that a CBP border search of electronic devices resulted in a specific complaint, without more, fails to provide compelling evidence that the search was conducted unlawfully or that the agency is engaging in a pattern of unlawful searches.

Nonetheless, given the passage of time since this issue was briefed, and the fact that the court is providing the parties an opportunity to rebrief the privacy interests at stake, *see supra* p.17, the court also will allow the parties an opportunity to further address the public interest in disclosure, should there be newer evidence of CBP's actions in connection with border searches relevant to the analysis.

In that regard, however, a brief discussion of Knight Institute's reliance on *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1 (D.C. Cir. 2011), is appropriate. Knight Institute argues that regardless of whether CBP has engaged in any illegal targeting in its border searches of electronic devices, the issue of such searches as a law enforcement policy is a sufficient matter of public concern to outweigh any privacy interests. Pl.'s Rep. at 23–24.

In *ACLU*, the ACLU sought court docket information on criminal prosecutions involving the use of warrantless cell phone tracking. *ACLU*, 655 F.3d at 3. The D.C. Circuit ordered the government to release docket information for the cases in which individuals had been convicted. *Id.* The Court reasoned that the issue of warrantless cell phone tracking was "a topic of considerable public interest . . . [which] has received widespread media attention," and that disclosure of this information "would inform this ongoing public policy discussion by shedding light on the scope and effectiveness of cell phone tracking as a law enforcement tool." *Id.* at 13–14. "Whether the government's tracking policy is legal or illegal, proper or improper, is irrelevant to the case . . . Matters of substantive law enforcement policy are properly the subject of public concern, whether or not the policy in question is lawful." *Id.* at 14 (cleaned up).

Significantly, however, in *ACLU* the information the D.C. Circuit ordered released pertained to individuals who had been convicted of a criminal offense. Their identities, and connection to law enforcement action, were publicly available. *ACLU*, 655 F.3d at 8. The exact opposite exists here. Unlike in *ACLU*, if the disclosure Knight Institute seeks would in fact identify a traveler, then that traveler risks having his or her identity associated with a CBP law enforcement action--searching electronic devices at the border--and the speculation that could arise were that association to be revealed. Thus, Knight Institute's reliance on *ACLU* is unavailing.

As explained above, the court denies summary judgment on CBP's Exemption 7(C) claim.[7]

### C.    FOIA EXEMPTION 7(E)

Finally, Knight Institute argues that CBP and ICE have improperly asserted Exemption 7(E) to withhold, in full or in part, EMRs, spreadsheets, traveler complaints, presentation, reports, communications, policies and handbooks.  Pl.'s MSJ at 25, n.37; Pl.'s Rep. at 16.

Exemption 7(E) protects law enforcement records or information which, if released, "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."   5 U.S.C. § 552(b)(7)(E); *Blackwell v. FBI*, 646 F.3d 37, 41–42 (D.C. Cir. 2011).  The risk of circumvention of the law need not be an actual or certain risk; it need only be "the chance of a reasonably expected risk."  *Mayer Brown LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).  The D.C. Circuit has noted that "[u]nder our precedents, Exemption 7(E) sets a relatively low bar for the agency to justify withholding" and "'only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'"  *Blackwell*, 646 F.3d at 42, quoting *Mayer Brown LLP*, 562 F.3d at 1194 (internal quotation marks and alterations omitted).

Notwithstanding the low bar, an agency may not simply recite the statutory standard; it "must at least provide *some* explanation of what procedures [or techniques] are involved and how they would be disclosed."  *Citizen for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 746

---

[7] Because the court has yet to determine whether Exemption 7(C) was properly asserted to withhold information, it need not yet address the applicability of Exemption 6.  *See supra* p. 15.

F.3d 1082, 1102 (D.C. Cir. 2014) (emphasis in original).  This excludes information that merely sets forth "standards for determining when the law has been violated"; such information is generally subject to release.  *PHE, Inc. v. U.S. Dep't of Just.*, 983 F.2d 248, 251–52 (D.C. Cir. 1993).

### 1.    ICE Withholdings

Knight Institute argues that ICE has not shown that Exemption 7(E) applies to certain information contained in policies and handbooks.  Pl.'s MSJ at 32 & n.42; Pl.'s Rep. at 17.  It claims that the withheld information consists of mere analyses informing ICE agents of the legal parameters under which they can perform a border search and thus, pursuant to *PHE*, must be released.  Pl.'s Rep. at 18.

For example, quoting from the Supplemental Declaration of Toni Fuentes ("Supp. Fuentes Decl."), ECF No. 57-3, Knight Institute contends that ICE withheld legal analyses in Homeland Security Investigations ("HSI") internal handbooks allegedly discussing such matters as "'when the agents are permitted to conduct searches without warrants."  Pl.'s Rep. at 18, quoting Supp. Fuentes Decl., ¶ 15.  This selective quote, however, ignores the remainder of the paragraph in the declaration, which states:

> The withheld information in this internal handbook provide law enforcement techniques and guidelines to special agents at the border to determine when a search of an [sic] electronic devices are [sic] warranted.  Disclosure of the content of these sections would allow the human traffickers or drug smugglers [to] know the circumstances under which they may be subjected to a search at or near the border, allowing them to change their tactics because they know the techniques in which the agents conduct searches at the border.

Supp. Fuentes Decl., ¶ 15.

The same is true with respect to a withheld section of the HSI "Computer Forensics Handbook," which Knight Institute claims addresses "'when a search is warranted with or without

consent.'"  Pl.'s Rep. at 18, quoting Supp. Fuentes Decl., ¶ 14.  Fuentes states that "[t]his section also provides guidance and instructions pertaining to various scenarios involving agents conducting searches at the border.  Disclosure of this information would allow bad actors to evade and circumvent the law by interfering with techniques agents use to conduct a search."  Supp. Fuentes Decl., ¶ 14.

Knight Institutes approaches additional withholdings by ICE in the handbooks in the same manner, selectively choosing a short phrase from the Supplemental Fuentes Declaration that, in isolation, sounds like a statement of law.  *See* Pl.'s Rep. at 18–19.  But a complete reading of the paragraphs Knight Institute cites from that Declaration makes clear that the withheld information consists of "techniques, protocols and guidelines" agents should follow in searching for electronic communications that may contain illegal material, pertaining to matters such as child sexual exploitation, or potential shooter or terrorist activities, and that disclosure of this information would aid violators in altering their strategies or actions to evade detection.  Supp. Fuentes Decl., ¶¶ 14–17.  This is the type of information Exemption 7(E) was designed to protect.  *See, id.* ¶¶ 17–18.  Accordingly, the court grants summary judgment to ICE on its Exemption 7(E) claim.

### 2.    CBP Withholdings

Knight Institute challenges CBP's withholding of four categories of information from EMRs, spreadsheets, and other communications: (1) reasons for searches, (2) whether a traveler was notified of the search and provided a "tear sheet", [8] (3) certain demographic information, and (4) internal analyses contained in these documents.  Pl.'s Rep. at 19.  Knight Institute argues that

---

[8] A "tear sheet" is a leaflet provided to a traveler notifying the traveler that a search of that person's items has been performed.  Defs' Rep., ECF No. 57-6, Ex. F.

CBP failed to demonstrate that release of this information would reveal any law enforcement technique, procedure or guideline, or risk circumvention of the law. *Id*.

Knight Institute relies on *Whittaker v. U.S. Dep't of Just.*, 2019 WL 2569915 (D.D.C. June 21, 2019) (*Whitaker I*), in which the court rejected the FBI's attempt to withhold the results of a name check in a background investigation report because the FBI had failed to adequately identify any technique or procedure that could be disclosed by revealing such results. *Id*. at * 3. But the court did allow the FBI an opportunity to further justify its invocation of Exemption 7(E). After being provided a more detailed explanation of the expected harm from releasing the results of a name check, the court granted a summary judgment to the FBI. *Whitaker v. U.S. Dep't of Just.*, 2020 WL 6075681, * 3–5 (D.D.C. Oct. 15, 2020) (*Whitaker II*). It found that disclosing the results of a name check "risks revealing the underlying techniques and procedures used to gather information about a person, and that is Defendants' ultimate — and valid — concern." *Id.* at * 5. The fact that the undisclosed information did not reveal a specific technique or procedure did not preclude the invocation of Exemption 7(E). The FBI was only required to demonstrate that "the disclosure would 'reduce or nullify' the effectiveness of the underlying method." *Id*., quoting *Vazquez v. U.S. Dep't of Just.*, 887 F. Supp. 2d 114, 116 (D.D.C. 2012). Knight Institute's reliance on *Whitaker I* is unavailing because, as in *Whitaker II,* here CBP has provided sufficient information to justify its withholdings.

Knight Institute first argues that CBP improperly withheld data from the "Reason for Search" field in the two-percent sample of EMRs and spreadsheets produced that compiled search statistics over an 18-month period. Pl.'s Rep. at 20. It points out that it does not seek the narrative section pertaining to these results, and claims that disclosure of the end reason for the search in such a small sample would provide an "incomplete and unreliable" basis for comparing how

different inspections were handled, and thus avoids revealing techniques and procedures. *Id.* at 20-21.[9]

CBP explains that "[w]hile travelers are generally obligated to present themselves [at the border] for inspection, only a fraction of a percent have their [electronic] devices searched, so explaining why CBP takes that specific action. . . clearly discloses CBP priorities and how CBP conducts risk assessments in utilizing its finite resources." 2d Howard Decl., ¶ 33. Disclosure of the reasons for a search in the sample would also "reveal information about CBP targeting efforts, ongoing operations, and lookouts[,]" and would permit potential violators "to assemble a picture of CBP's law enforcement focus and to identify CBP operations during specific timeframes," all of which would allow those seeking to circumvent the law to adjust their behavior to avoid action they know would result in a probable search. *Id.* ¶¶ 34–35. Disclosure of such information, therefore, would reveal investigative techniques and procedures which would risk circumvention of the law.

Knight Institute next argues that CBP improperly withheld information documenting whether a traveler whose electronic devices were searched was informed of the search, whether a tear sheet was provided to the traveler, and, if not, the reason for not providing it. Pl.'s Rep. at 22. Relying again on *Whitaker II*, Knight Institute claims that CBP has failed to demonstrate how disclosure of this information would reveal a technique or procedure used to gather information, or risk circumvention of future searches. Pl.'s Rep. at 22.

---

[9] Inexplicably, Knight Institute argues that one spreadsheet CBP produced "contains the stated reasons for all searches conducted over a six-year period. . ." Pl.'s Rep. at 21, citing Declaration of Matthew Hellman ("Hellman Decl."), Ex. B, ECF No. 50-7. On the contrary, this spreadsheet, which appears to cover only 2011, specifically states: "Information from the following data fields was excluded from this spreadsheet as exempt under FOIA exemption 7(E): . . . Reason for Search . . ." Hellman Decl. Ex. B. at 2.

CBP explains that:

> By law and policy, when a CBP officer conducts a border search of information on an electronic device, the officer must notify the individual subject to the search of the purpose and authority for such search, how the individual may obtain more information on reporting concerns about their search, and how the individual may seek redress from the agency if he or she feels aggrieved by a search. However, such notification is not required if it would impair national security, law enforcement, officer safety, or other operational interests.

2d Howard Decl., ¶ 37.

Releasing information regarding whether a traveler was notified of a search, in documents reflecting all searches performed during a particular period, obviously would reveal that some travelers who were searched were not notified of the search. CBP adequately explains that releasing information about a traveler who was searched but who was not notified of the search would reveal the nature of the government's interest in that traveler, i.e., "the inspecting officer believed the search implicated a national security, law enforcement, officer safety, or other operational interest . . . This may, in turn, lead the individual to take additional steps to conceal harmful or illicit material and frustrate future investigative efforts." *Id.* at ¶ 38.

Disclosing the fact that a traveler was not notified of a border search, like disclosing the name check results in *Whitaker II*, "risks revealing the underlying techniques and procedures used to gather information about a person, and that is Defendants' ultimate – and valid – concern." *Whitaker II*, 2020 WL 6075681, at * 5. As CBP points out, disclosure of this information would reveal "CBP's evaluation of the law enforcement value of information uncovered during the inspection." 2d Howard Decl., ¶ 39.

Knight Institute also argues that because CBP is authorized to conduct searches "without any individualized suspicion", travelers cannot avoid "being searched by studying the reasons" other travelers were searched. Pl.'s MSJ at 31. But the fact that CBP conducts random border

searches does not mean that it does not also conduct targeted border searches, and Knight Institute

does not argue otherwise.  Allowing travelers to learn the reasons for border searches of electronic

devices could allow them to learn what behaviors to avoid to minimize the risk of a search in the

future.  2d Howard Decl., ¶ 34.  This certainly qualifies as "the chance of a reasonably expected

risk" of circumvention of the law were this information disclosed.  *Mayer Brown LLP*, 562 F.3d

at 1193.

Knight Institute next argues that CBP has failed to show how the release of "certain

demographic information", such as travelers' nationalities and gender, "compiled into aggregate

search statistics, would reveal information about technique, procedure, or guideline."  Pl.'s Rep.

at 22–23.  Knight Institute again too narrowly interprets the language of Exemption 7(E).

According to CBP, releasing aggregate statistics about the nationalities of travelers whose

devices were searched at the border could reveal, for example, that:

> a high number of individuals of a certain nationality whose devices were searched
> on days that correspond to a flight from [a particular] [] country that lands at a
> particular airport may reveal the existence of an ongoing operation at that airport.
> Disclosing this information poses a risk of circumvention of the law by providing
> potential adversaries the ability to identify circumstances in which a device search
> may be more or less likely, or by revealing the capabilities or vulnerabilities of
> CBP inspection techniques.  Additionally, release of this information, without
> context, may jeopardize the relationship that CBP has with foreign partners based
> on the relative frequency with which device searches are performed on travelers
> of any particular nationality compared to travelers of another nationality. This
> could have a negative impact on CBP's cooperative activities and information
> sharing with that country, which CBP relies on to assist in identifying illicit actors
> or threats to border security.

2d Howard Decl., ¶ 41.

This demonstrates that CBP's targeting techniques and procedures for engaging in an

electronic search of devices may be revealed if aggregate demographic information were disclosed,

26

and could adversely affect CBP operations and activities that could result in circumvention of the law.

The same would hold true with respect to gender.  Aggregate information about the gender of travelers who are subjected to a border search of electronic devices could disclose CBP's techniques and procedures for determining how to use limited resources to conduct such searches. As CBP explains, "aggregated information can reveal the historic probability that a device search will occur under certain circumstances, or it may reveal the reasons CBP typically initiates device searches.  Such information can be used by illicit actors to gauge the likelihood that they will experience a search under certain circumstances and to take steps to avoid scrutiny." *Id*. ¶ 40.  It is reasonable to conclude that if CBP's statistics, in the aggregate, demonstrate that CBP targets men more than women for border searches of electronic devices, those seeking to evade such searches would use female travelers more frequently.  Consequently, CBP's targeting priorities are techniques and procedures properly withheld here under Exemption 7(E).

Finally, Knight Institute argues that CBP improperly withheld information from internal memoranda relating to the CRCL Impact Assessment.  Pl.'s MSJ at 33; Pl.'s Rep. at 23–24. Specifically, Knight Institute challenges the withholding in three specific records: (1) CBP Internal Affairs Report: Search of Electronic Devices and Documents, (2) Electronic Device Inspection: A Follow-Up Study to CRCL, and (3) CBP Comment on CRCL Impact Assessment for Border Searches of Electronic Devices.  Pl.'s MSJ at 33, n.43; Pl.'s Rep. at 23–24.

CBP explains that in its interaction with CRCL, it provided CRCL with sensitive law enforcement information, alleging that "each of these records [identified by Knight Institute] contain [sic] descriptions and analyses of the techniques, procedures, and guidelines used by CBP to conduct border searches of electronic devices."  2d Howard Decl. ¶ 53.  Given the court's

27

findings that CBP properly invoked Exemption 7(E) to withhold information that would disclose its techniques, procedures, and guidelines for engaging in border searches of electronic devices, it makes no difference that this information was shared with CRCL. *See*, *e.g.*, *McGehee v. CIA*, 697 F.2d 1095, 1111 (D.C. Cir. 1983) (information shared from one agency to another does not preclude application of FOIA exemptions).

CBP's *Vaughn* index describes the material withheld in the records identified by Knight Institute as containing information that

> would reveal scope and focus of inspection techniques, . . . information regarding law enforcement alerts or lookouts, descriptions of the tendencies or the frequency with which certain inspection techniques occur at various ports or locations, analysis of the frequency with which certain types of law enforcement encounters occur at various locations or under certain conditions, . . . descriptions of factors, criteria or methods considered when deciding whether to utilize particular inspection methods, recordkeeping requirements that reveal the reason, scope of focus of certain inspection techniques, . . . and descriptions of the handling, maintenance and storage of law enforcement or national security information obtained from a border inspection.

ECF No. 46-4, CBP *Vaughn* at 26–27.

CBP also redacted information that could reveal inspection trends, such as port locations, biographical information regarding subjects of inspection, and the reason for a search. *Id.* at 29. As noted above, the release of this type of information would give travelers bent on violating the law insight into CBP's targeting priorities and thus allow them to modify their behaviors to decrease the likelihood of a search. *See supra* pp. 21–25.

CBP has adequately explained that the information it withheld under Exemption 7(E), and this is the type of information Exemption 7(E) was designed to protect. Accordingly, the court grants summary judgment to CBP on its Exemption 7(E) claim.

**D.      SEGREGABILITY**

28

FOIA provides that if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). The agency bears the burden to "describe[] the justifications for withholding the information with specific detail." *DiBacco v. Dep't of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019). To establish that all reasonably segregable, nonexempt information has been disclosed, an agency need only show "with reasonable specificity" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578–79 (D.C. Cir. 1996) (quotation omitted); *Canning v.U.S. Dep't of Just.*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008). When an agency demonstrates that it has undertaken a "page-by-page" review of all the documents, and then submits a declaration attesting that the information withheld is not reasonably segregable, this is sufficient to show that an entire document, or particular information within a document, cannot be produced. *Juarez v. U.S. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008); *see also, Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 178–79 (D.D.C. 2011).

DHS, CBP, and ICE attest that they reviewed the documents at issue "line by line" and released all "reasonably segregable information." [First] Declaration of James V.M.L. Holzer ("1st Holzer Decl."), ECF No. 46-3, ¶ 49, 1st Howard Decl., ¶ 40, Declaration of Toni Fuentes ("Fuentes Decl."), ECF No. 46-7, ¶ 48. Relying on *American Immigration Council v. U.S. Department of Homeland Security,* 950 F. Supp. 2d 221, 248 (D.D.C. 2013), Knight Institute argues that such attestations, and the *Vaughn* indices and declarations provided, are insufficient to meet FOIA's segregability requirement. *See* Pl.'s MSJ at 35; Pl.'s Rep. at 25, 29–30.

29

In the *American Immigration Council,* the court held that merely claiming that each record had been reviewed line-by-line to ensure that all nonexempt information had been released, and that no segregable information remained to be released, was insufficient to meet the government's burden to demonstrate that all reasonably segregable information had been released. *Am. Immigr. Council*, 950 F. Supp. 2d at 248. Notably, however, the court found the government's explanation of its withholdings inadequate, *id*., which, with two limited exceptions, is not the case here.

As the D.C. Circuit held in *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771 (D.C. Cir. 2002), when an agency provides "a comprehensive *Vaughn* index, describing each document withheld, as well as the exemption under which it was withheld[,]" along with a declaration stating that each document had been reviewed "line-by-line" and that no documents contained reasonably segregable information that could be released, the *combination* of these submissions adequately fulfills the agency's obligation to demonstrate with "'reasonable specificity' why a document cannot be further segregated." *Johnson,* at 776; *see Loving v. Dep't of Defense*, 550 F.3d 32, 41 (D.C. Cir. 2008).

Here, DHS, CBP, and ICE have submitted comprehensive *Vaughn* indices for the documents covered, and detailed declarations which include attesting to a line-by-line review of the documents at issue. *See* 1st Holzer Decl., ¶ 49 & Ex. A; 2d Holzer Decl., Attach.; 1st Howard Decl., ¶ 40 & Attach., Fuentes Decl., ¶¶ 48–49 & Ex. C; Supp. Fuentes Decl., ¶¶ 24–25 & Ex. C. Knight Institute identifies certain documents that it claims must have segregable information for release but offers no more than speculation as to the information withheld and the appropriateness of the exemptions claimed.[10] *See* Pl.'s MSJ at 35–38 & n.44. This cannot overcome the Agencies'

---

[10] For example, Knight Institute points to a five-page CBP traveler complaint, two pages of which were withheld in full. Pl.'s MSJ at 37, citing ECF No. 50-15, Hellman Decl., Ex. J. A review of that document shows that in numerous places CBP segregated and released full

detailed declarations and *Vaughn* indices.  *See, e.g.*, *Heffernan v. Azar*, 417 F. Supp. 3d 1, 20 (D.D.C. 2019) (noting that plaintiff's mere speculation that segregable information exists is insufficient to overcome declarations and *Vaughn* index representations).

Agencies are entitled to the "presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007); *Heffernan*, 417 F. Supp.3d at 20.  Knight Institute has produced no sufficient evidence to overcome that presumption, given the Agencies' comprehensive *Vaughn* indices and declarations.

Thus, because DHS, CBP, and ICE carefully reviewed the material withheld and determined that no additional non-exempt information could be released, with two limited exceptions, *see supra,* pp. 12–13; *infra* pp. 32–33, the court concludes that FOIA's segregability requirement has been met.

### E.    COMPLETENESS OF THE DHS AND ICE VAUGHN INDICES

#### 1.    DHS Records

Knight Institute argues that DHS has failed to provide any justification for withholding information in certain documents.  In particular, it claims that DHS has not explained its withholding in documents produced on April 30, 2018, and May 20, 2018, which were included in the Bates number prefix "513".  Pl.'s Rep. at 26, citing Hellman's Decl., Exs. CC & V, ECF No. 50-34 & 50-27.  DHS responds that it did not release any documents in connection with this litigation that included in the prefix "513."  2d Holzer Decl., ¶ 8 & n.1.

DHS's April 30 and May 20, 2018 letters state that they are interim responses to Knight Institute's FOIA request to DHS "dated March 7, 2017."  Hellman Decl., Ex. CC & Ex. V.  That

---

paragraphs and portions of sentences.  The fact that two pages were withheld in full pursuant to three exemptions does not undermine CBP's segregability determination.

request is not before this court. The Amended Complaint in this case covers a March 15, 2017 FOIA request to DHS. *Id.* ¶ 1. Accordingly, DHS has not failed to address documents with the prefix "513" in this litigation.

Next Knight Institute argues that DHS failed to justify the withholding of certain information in documents withheld pursuant to Exemption 5. Pl.'s Rep. at 26–27. Yet it concedes that those documents were, in fact, addressed in a DHS supplemental *Vaughn* index. *Id*. at 27. The fact that Knight Institute disagrees with DHS's explanation for withholding information does not mean that DHS failed to provide a justification for its segregability determination.

Finally, Knight Institute claims that DHS failed to justify the application of Exemption 5 to the DHS page DHS-001-00585-001998. Pl.'s Rep. at 28; Hellman Decl., ECF No. 60-8, Ex. MM. Knight Institute is correct that this document contains one paragraph withheld only under Exemption 5. The basis for Exemption 5 is unclear, given that the words "Protected by the Deliberative Process Privilege" have been crossed out. Hellman Decl., Ex. MM, at DHS-001-00585-001998. Knight Institute correctly notes that DHS's supplemental *Vaughn* index, which addresses DHS-001-00585-001998, fails to address the application of Exemption 5 to this paragraph. *See* 2d Holzer Decl., Attach., DHS Supp. *Vaughn* index at 31–33.

Accordingly, the court denies summary judgment to DHS on the application of Exemption 5 to DHS-001-00585-001998. DHS will be given an opportunity to address this failure, as set forth in the accompanying order.

### 2. ICE Records

Knight Institute also argues that ICE did not address hundreds of withheld records in its *Vaughn* index. Pl.'s MSJ at 40, n.51; Pl.'s Rep. at 28. ICE responds that Knight Institute had agreed to accept a sample *Vaughn* index, which necessarily would not include every responsive

document processed by ICE.  Defs' Rep. at 33, citing 6th JSR, ECF No. 29, at 3, 6–7; 7th JSR, ECF No. 30, at 2; 8th JSR, ECF No. 31, at 1.

Under FOIA, a sample *Vaughn* index is acceptable when a large number of documents are at issue, and thus, preparation of a *Vaughn* index addressing each document would be unduly burdensome.  *Weisberg v. U.S. Dep't of Just.,* 745 F.2d 1476, 1490 (D.C. Cir. 1984).  A sample *Vaughn* index may be based on a random or representative sample.  *Id*. (random sample); *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1149–51 (D.C. Cir. 1991) (representative sample).  There is no bright line as to how sampling should be conducted, and an appropriate sample will vary with the "sample size, level of confidence the sample is representative of the whole, number of exemptions claimed per document, the conduct of the litigants and complexity of the requests, to name a few[.]" *Shapiro v. Dep't of Just.,* 2020 WL 3615511, * 14 (D.D.C. July 2, 2020).  A sample *Vaughn* index can therefore cover documents agreed upon by the parties, as was the case here.

In several JSRs, the parties made representations regarding ICE's preparation of a *Vaughn* index.  In the 6th JSR, ICE offered to provide Knight Institute with a sample *Vaughn* index and asked Knight Institute to identify the categories of withholdings that it intended to challenge.  6th JSR, ¶ 13(d).  Knight Institute responded that it wanted to review a draft sample *Vaughn* before deciding which ICE withholdings it would challenge, and identified certain withholdings that it wanted addressed in the draft.  *Id*.  ¶ 14(c).  In the 7th JSR, ICE stated that it was waiting for Knight Institute to identify the reports of investigation that it needed to include in its *Vaughn* index.  7th JSR, ¶ 4(a).  In the 8th JSR, Knight Institute reported that it had sent an Excel spreadsheet to ICE "'identifying the beginning and end Bates numbers of the [74] documents we would like ICE to include in its sample Vaughn index.'"  8th JSR, ¶ 1 (further citation not provided).  ICE made clear to Knight Institute that it viewed its only further obligation with respect to the items requested

from ICE under the FOIA, to be "to provide such justifications as plaintiffs might request for the withholdings it had made from records responsive to those items." 9th JSR, ECF No. 32, ¶ 3. ICE then produced its *Vaughn* index to Knight Institute on September 20, 2018. *Id*. ¶ 6; ECF No. 30 at 2.

Both DHS and CBP subsequently referred additional documents to ICE for processing, and Knight Institute notes that those documents were not included in the sample *Vaughn* index. Pl.'s Rep. at 28–29 & the citations therein. In the 14th JSR, the parties represented that after ICE completed its work on processing the referred documents, the parties would confer as to the scope of any anticipated challenges. 14th JSR, ECF. No. 43, ¶ 6. Knight Institute, however, points to no evidence that it asked ICE to supplement its sample *Vaughn* index with respect to these referred documents, or any other documents. Pl.'s Rep. at 28-29.

Although Knight Institute identified the ICE exemption withholdings it intended to challenge, 15th JSR, ECF No. 44, ¶ 3, it proffers no evidence that it asked ICE to supplement its sample *Vaughn* index or to create a full *Vaughn* index of all exemption claims made in the responsive documents. Instead, on November 15, 2019, Knight Institute proposed a briefing schedule for cross motions for summary judgment, to which the Agencies agreed. 15th JSR, ¶¶ 6–7. By Order dated December 2, 2019, the court adopted the parties' proposed briefing schedule. ECF No. 45.

The court concludes from the record that Knight Institute accepted a sample *Vaughn* index from ICE and did not ask ICE to supplement its sample or inform ICE that it expected summary judgment briefing to include a different *Vaughn* index than the one ICE had produced. Having essentially represented to ICE that it would accept the sample *Vaughn* index provided, Knight Institute cannot now complain that it received an inadequate sample *Vaughn* index from ICE.

34

## IV.   CONCLUSION

For the reasons set forth above, the court will DENY Knight Institute's cross-motion for partial summary judgment, ECF No. 50, and will GRANT in part and DENY in part the Agencies' motion for summary judgment, ECF No. 46.   The Agencies' motion will be GRANTED with respect to all issues except the applicability of Exemption 5 to DHS-001-00585-001998, and to CBP's spreadsheets, and the applicability of Exemptions 6 and 7(C).   Both DHS and CBP may renew their dispositive motion with respect to the applicability of Exemption 5 to these documents, or release the withheld information, as set forth in the accompanying order, and CBP may renew its dispositive motion addressing the applicability of Exemptions 6 and 7(C).

Date:  May 5, 2026

TANYA S. CHUTKAN
United States District Judge